COPY

1  MICHAEL FEUER (SBN 111529)
   CITY ATTORNEY
2  CITY OF LOS ANGELES
   200 N. Main Street, Room 800
3  Los Angeles, CA 90012
   Telephone: (213) 978-8100
4  Email: Mike.feuer@lacity.org

5  STEVE W. BERMAN (*pro hac vice* pending)
   HAGENS BERMAN SOBOL SHAPIRO LLP
6  1918 8th Avenue, Suite 3300
   Seattle, WA 98101
7  Telephone: (206) 623-7292
   Email: steve@hbsslaw.com
8
9  ELAINE T. BYSZEWSKI (SBN 222304)
   LEE M. GORDON (SBN 174168)
   HAGENS BERMAN SOBOL SHAPIRO LLP
10 301 North Lake Avenue, Suite 203
   Pasadena, CA 91101
11 Telephone: (213) 330-7150
   Email: elaine@hbsslaw.com
12 Email: lee@hbsslaw.com

13 [Additional Counsel Listed on Signature Page]

14 *Attorneys for Plaintiff the City of Los Angeles*

15              UNITED STATES DISTRICT COURT

16              CENTRAL DISTRICT OF CALIFORNIA

17 CITY OF LOS ANGELES, a municipal    No. CV13-09007-ODW(RZx)
18 corporation,

19                      Plaintiff,      COMPLAINT FOR VIOLATION
                                        OF THE FEDERAL FAIR
20     v.                               HOUSING ACT

21 WELLS FARGO & CO., and WELLS        DEMAND FOR JURY TRIAL
   FARGO BANK, N.A.,
22
                        Defendants.
23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-14 658983 V2

FILED
CLERK, U.S. DISTRICT COURT

DEC - 5 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

**TABLE OF CONTENTS**

<u>Page</u>

I.   NATURE OF THE ACTION .................................................................. 1

    A.   Wells Fargo Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Los Angeles Resulting in Foreclosures ................................................................ 1

II.   PARTIES ............................................................................................. 10

III.   JURISDICTION AND VENUE ......................................................... 12

IV.   FACTUAL BACKGROUND ............................................................. 12

V.   WELLS FARGO ENGAGED IN DISCRIMINATORY LENDING PRACTICES .......................................................................................... 15

    A.   Wells Fargo Permits and Promotes Discriminatory Lending ............... 15

        1.   Wells Fargo's mortgage loan channels ...................................... 15

        2.   Product Placement. ...................................................................... 17

        3.   Wholesale mortgage broker fees. ............................................... 22

    B.   Wells Fargo's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act ................................ 27

        1.   Discriminatory lending results in a disproportionate number of foreclosures in minority areas. .................................. 27

        2.   Minority neighborhoods are disproportionate recipients of predatory loans. ...................................................................... 28

        3.   Statistical analyses conducted by the United States Department of Justice of data for loans originated by Wells Fargo showed a disparate impact on minority borrowers. ....................................................................................... 33

            a.   Minority borrowers were more likely than whites to receive subprime loans. ................................................ 33

            b.   Minority borrowers were more likely than white borrowers to pay higher broker fees and costs. ................. 35

    C.   Wells Fargo Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act, as Demonstrated by Former Bank Employees ..................................... 38

        1.   Wells Fargo targets minorities for predatory loan terms. ............ 40

2.  Wells Fargo gives its employees discretion to steer people who qualify for conventional mortgages into discriminatory mortgages (and pays its employees more for doing so)..............................................................43

3.  Wells Fargo underwrites adjustable rate loans that borrowers cannot afford..................................................44

4.  Wells Fargo limits the ability of minority borrowers to refinance out of the same predatory loans that they previously received from the Bank....................................45

5.  Wells Fargo engages in other abusive lending practices............46

D.  Minorities in Fact Receive Predatory Loan Terms from Wells Fargo...........................................................................47

E.  Minorities in Los Angeles Receive Such Predatory Loan Terms from Wells Fargo Regardless of Creditworthiness.................49

F.  Wells Fargo's Targeting of Minorities who in Fact Receive Predatory Loan Terms Regardless of Creditworthiness Causes Foreclosures ...........................................................................52

1.  Data shows that Wells Fargo's foreclosures are disproportionately located in minority neighborhoods in Los Angeles. ........................................................................52

2.  Data shows that Wells Fargo's loans to minorities result in especially quick foreclosures.............................................55

3.  Data shows that the discriminatory loan terms cause the foreclosures. ......................................................................56

VI.  INJURY TO LOS ANGELES CAUSED BY WELLS FARGO'S DISCRIMINATORY LOAN PRACTICES......................................58

A.  Los Angeles has been Injured by a Reduction in Property Tax Revenues from Foreclosures Caused by Discriminatory Loans Issued by Wells Fargo................................................................59

1.  The decreased value of the properties foreclosed by Wells Fargo result in reduced property tax revenues. ................59

2.  The decreased value of properties in the neighborhoods surrounding foreclosed properties results in reduced property tax revenues..........................................................60

B.  Los Angeles Is Injured Because It Still Must Provide Costly Municipal Services for Properties in Minority Neighborhoods that Have Become Vacant as a Direct Result of Discriminatory Loans Originated or Purchased by Wells Fargo...........................................................................62

- ii -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-14  658983 V2

VII.     SAMPLE FORECLOSURE PROPERTIES IN THE CITY OF LOS ANGELES ........................................................................................ 63

VIII.    STATUTE OF LIMITATIONS AND CONTINUING VIOLATIONS DOCTRINE ........................................................... 64

IX.      CLAIMS FOR RELIEF ........................................................... 64

FIRST CLAIM FOR RELIEF (Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*) ........................................................... 64

SECOND CLAIM FOR RELIEF (Common Law Claim For Restitution Based On California Law) ........................................................... 67

DEMAND FOR JURY TRIAL ........................................................... 67

PRAYER FOR RELIEF ........................................................... 67

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- iii -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-14 658983 V2

# I.    NATURE OF THE ACTION

1.    It is axiomatic that banks should not make discriminatory loans.  Banks must extend credit to minorities on equal terms as they do to other similarly situated borrowers.  Banks should not target minority neighborhoods for loans that discriminate nor make loans to minorities on terms that are worse than those offered to whites with similar credit characteristics.  When banks engage in such discriminatory conduct, the misconduct has profound financial consequences for the cities in which mortgaged properties exist, and banks should be responsible for those financial consequences.  Banks should reimburse such cities for lost tax revenues due to discriminatory lending.  And banks should pay the costs of repairing and maintaining properties that go into foreclosure due to discriminatory lending.  This lawsuit arises because Wells Fargo breached these legally-mandated obligations, and foreseeably injured the City of Los Angeles.

## A.    Wells Fargo Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Los Angeles Resulting in Foreclosures

2.    This suit is brought pursuant to the Fair Housing Act of 1968 ("FHA"), as amended, 42 U.S.C. §§ 3601, *et seq.*, by the City of Los Angeles ("Los Angeles" or "City") to seek redress for injuries caused by Wells Fargo's[1] ("Wells Fargo" or "the Bank") pattern or practice of illegal and discriminatory mortgage lending. Specifically, Los Angeles seeks injunctive relief and damages for the injuries caused by foreclosures on Wells Fargo's loans in minority neighborhoods and to minority borrowers that are the result of Wells Fargo's unlawful and discriminatory lending practices.  The unlawful conduct alleged herein consists of both intentional discrimination and disparate impact discrimination.

---

[1] Defendants collectively are referred to as "Wells Fargo," including:  Wells Fargo & Co., and Wells Fargo Bank, N.A. Plaintiff alleges that Defendants are also liable for residential home loans and lending operations acquired from, and/or sold by or through, AM Mortgage Network DBA Vertice, American Mortgage, American Mortgage Network, American Mortgage Network DBA Vertice, Wachovia Mortgage, Wachovia Mortgage, FSB, Wells Fargo Financial California, World Savings Bank, and World Savings Bank, FSB.

3.     Wells Fargo has engaged in a continuous pattern and practice of mortgage discrimination in Los Angeles since at least 2004 by imposing different terms or conditions on a discriminatory and legally prohibited basis.  In order to maximize profits at the expense of the City of Los Angeles and minority borrowers, Wells Fargo adapted its unlawful discrimination to changing market conditions. This unlawful pattern and practice is continuing through the present and has not terminated. Therefore, the operative statute of limitations governing actions brought pursuant to the Federal Fair Housing Act has not commenced to run.

4.     The pattern and practice of lending discrimination engaged in by Wells Fargo consists of traditional redlining[2] and reverse redlining,[3] both of which have been deemed to violate the FHA by federal courts throughout the country.  Wells Fargo engaged in redlining, and continues to engage in said conduct, by refusing to extend mortgage credit to minority borrowers in Los Angeles on equal terms as to non-minority borrowers.  Wells Fargo engaged in reverse redlining, and continues to engage in said conduct, by extending mortgage credit on predatory terms to minority borrowers in minority neighborhoods in Los Angeles on the basis of the race or ethnicity of its residents.  Federal Reserve Chairman Ben Bernanke recently acknowledged these twin evils of mortgage discrimination, and explained that both types of mortgage discrimination "continue to have particular significance to mortgage markets."[4]

5.     Major banks such as Wells Fargo have a long history of engaging in redlining throughout Los Angeles.  That practice began to change in the late 1990s, when Wells Fargo adapted to changing market conditions and began to flood

---

[2] Redlining is the practice of denying credit to particular neighborhoods based on race.

[3] Reverse redlining is the practice of flooding a minority community with exploitative loan products.

[4] Remarks by Federal Reserve Chairman Ben Bernanke at the Operation HOPE Global Financial Dignity Summit, Atlanta, Georgia at pg. 10 (November 15, 2012) available at www.federalreserve.gov/newsevents/speech/bernanke20121115a.htm.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-14  658983 V2

- 2 -

historically underserved minority communities with mortgage loans that consisted of a variety of high cost and abusive mortgage loan products with predatory terms when compared to the mortgage loans issued to similarly situated white borrowers (reverse redlining).

6.      Wells Fargo's discriminatory lending practices have the purpose and effect of placing vulnerable, underserved borrowers in loans they cannot afford. Reverse redlining maximizes Wells Fargo's profit without regard to the borrower's best interest, the borrower's ability to repay, or the financial health of underserved minority neighborhoods.  Moreover, Wells Fargo has averted any significant risk to itself by selling the vast majority of mortgage loans it originates or purchases on the secondary market (collectively "Wells Fargo Loans").

7.      Between 1996-2006, one category of discriminatory loan products – subprime loans – grew throughout the country from $97 billion to $640 billion.  These loans were frequently targeted to minorities.  Upon information and belief, the lack of accessible credit resulting from Wells Fargo's previous pattern and practice of redlining in the minority communities in Los Angeles created conditions whereby the Bank could easily target and exploit tunderserved minority communities which, due to traditional redlining, had been denied credit.

8.      Thereafter, following several years of issuing abusive, subprime mortgage loans throughout the minority communities of Los Angeles, commencing in or around 2007, Wells Fargo once again adapted to changing market conditions while continuing its pattern and practice of issuing a variety of discriminatory loan products. Simultaneously, Wells Fargo also decided to curtail the issuance of mortgage credit to minority borrowers in Los Angeles.[5]  In other words, Wells Fargo not only refused to extend credit to minority borrowers when compared to white borrowers, but when the

---

[5] California Reinvestment Coalition, *From Foreclosure to Re-Redlining* (2010), at 4 (available at http://www.calreinvest.org/system/resources/.../Foreclosure_to_Re_Redlining.pdf).

Bank did extend credit, it did so on predatory terms.  This combination of reverse redlining and redlining represents a continuing and unbroken pattern and practice of mortgage lending discrimination in Los Angeles that still exists today.

9.      Wells Fargo's pattern and practice of *reverse redlining* has caused an excessive and disproportionately high number of foreclosures on the Wells Fargo Loans it has made in the minority neighborhoods of Los Angeles.  Foreclosures on loans originated by Wells Fargo are concentrated in these neighborhoods even though the bulk of Wells Fargo's lending in Los Angeles is in white neighborhoods.  *A loan in a predominantly minority neighborhood is 4.982 times more likely to result in foreclosure than is a loan in a predominantly white neighborhood.*

10.      Wells Fargo's pattern and practice of *traditional redlining* has also caused an excessive and disproportionately high number of foreclosures in the minority neighborhoods of Los Angeles.  These foreclosures often occur when a minority borrower who previously received a predatory loan sought to refinance the loan, only to discover that Wells Fargo refused to extend credit at all, or on equal terms as when refinancing similar loans issued to white borrowers.  The inevitable result of the combination of issuing a predatory loan, and then refusing to refinance the loan, was foreclosure.

11.      Wells Fargo would have had comparable foreclosure rates in minority and white communities if it was properly and uniformly applying responsible underwriting practices in both areas.  Wells Fargo possesses sophisticated underwriting technology and data that allows it to predict with precision the likelihood of delinquency, default, or foreclosure.  The fact that Wells Fargo's foreclosures are so disproportionately concentrated in minority neighborhoods is not the product of random events.  To the contrary, it reflects and is fully consistent with Wells Fargo's practice of targeting minority neighborhoods and customers for discriminatory practices and predatory pricing and products.  It also reflects and is consistent with

Wells Fargo's practice of failing to underwrite minority borrowers' applications properly, and of putting these borrowers into loans which (1) have more onerous terms than loans given to similarly situated white borrowers, and (2) the borrowers cannot afford, leading to foreclosures.

12. The Bank's discriminatory lending practices, including targeting of minorities and the unbridled discretion and incentive arrangements that result in the disproportionate issuance of discriminatory loans to minorities, are evidenced by information from confidential witness statements provided by former employees of Wells Fargo (discussed further herein). For example:

(a) "Steering was rampant," because a higher commission was paid on subprime. Regarding first-time home buying programs – "That was pushed heavy, heavy in lower-income neighborhoods. . . They steered more into subprime lending."

(b) "There were zillions of loans that should never have been approved according to what was written in their guidelines."

(c) "There was no limit to what you could do to drum up business." Hispanics, "especially," were seen as presenting "so much opportunity because there were so few who were in houses."

(d) "It was so unbelievable to me the things that I could get done," she said. "I would say, no that's never gonna fly, and in some cases I would make the recommendation or the referral, and it would happen. … You have a person who's never paid a bill, and you give them a loan."

(e) "I heard there were some non-minority loan officers that would routinely refer minorities to the [subprime] MoRe division even when they didn't have to go there."

(f) "I would say there was [targeting of minorities]. You do hear the stories and stuff."

(g) Since 2010, "I did not see a lot of minority loans being approved. Most of the loans coming across my desk were Caucasian, but not a lot of Hispanic or African-American. Most of the loans I was approving were

white."  Wells Fargo "changed the rules" on these borrowers when it refused to permit them to refinance.

13.     The reports of these witnesses are confirmed when Los Angeles data on Wells Fargo loans is examined.  Such an examination reveals a widespread practice of discrimination.  For example, a regression analysis that controls for credit history and other factors demonstrates that an African-American Wells Fargo borrower was 2.078 times more likely to receive a predatory loan than was a white borrower, and a Latino borrower was 1.548 times more likely.  The regression analysis confirms that African-Americans with FICO scores over 660 are 2.124 times more likely to receive a predatory Wells Fargo loan as is a white borrower, and a Latino borrower is 1.613 times more likely.

14.     To date, successful discriminatory lending actions alleging conduct similar to that alleged herein have been brought against Wells Fargo by the City of Baltimore, the City of Memphis, the Department of Justice, and the Federal Reserve Bank.  The Federal Reserve levied an $85 million penalty against Wells Fargo, representing the largest penalty it has assessed in a consumer protection enforcement action.

15.     The Department of Justice's Civil Rights Division determined that mortgage brokers who generated loan applications through Wells Fargo's wholesale channel, and were granted broad pricing discretion by Wells Fargo, had charged higher fees and rates to tens of thousands of minority borrowers across the country than they had to white borrowers who posed the same credit risk – selling what Wells Fargo employees in Baltimore referred to as "ghetto loans."

16.     The past several years have been highly profitable for Wells Fargo. According to a January 11, 2013, press release, the Bank generated a record amount of:

(i) net income ($18.9 billion); and (ii) diluted earnings per share ($3.36).[6]  The

following charts illustrate these results.

Net Income (millions)



Earnings per share



17.   The $19 billion that the Bank reported as profit in 2012 is more than

double the annual profit that it reported during the boom years of 2003-2007.  During

_____

[6] Press Release, Wells Fargo & Co., Wells Fargo Reports Record Full Year and
Quarterly Net Income (Jan. 11, 2013), Business Wire.

the crisis years of 2009-2012, Wells Fargo reported a combined $59 billion in profits, while millions lost their homes.

18.     At the same time that Wells Fargo achieved record financial success, the Bank's discriminatory practices and resulting foreclosures in the City's minority neighborhoods have inflicted significant, direct, and continuing financial harm to the City.  Since 2008, banks have foreclosed on approximately 1.7 million homes in California, and Wells Fargo is responsible for nearly one in five of these foreclosures.

19.     One report[7] has estimated the impact that the City of Los Angeles has suffered as follows:

- Overall, Los Angeles homeowners are estimated to have lost $78.8 billion in home values as a direct result of the 200,000 foreclosures for 2008-2012 alone.

- Property tax revenue losses are estimated to be $481 million in the wake of the foreclosure crisis.

- The typical foreclosure costs local governments more than $19,000 for increased costs of safety inspections, police, and fire calls, trash removal, and property maintenance.  In Los Angeles, these costs are estimated to be $1.2 billion.

- Los Angeles has 79,029 homeowners underwater, totaling $7.3 billion in loan value.  If banks wrote down those mortgages, it could pump $780 million into the local economy, and create 11,353 jobs.

20.     In this action the City seeks damages due to reduced property tax revenues based on:  (a) the decreased value of the vacant properties themselves, and (b) the decreased value of properties surrounding the vacant properties.  In addition, the City seeks damages based on the cost of municipal services that will be required to

---

[7] Alliance of Californians for Community Empowerment and the California Reinvestment Coalition, *The Wall Street Wrecking Ball:  What Foreclosures are Costing Los Angeles Neighborhoods* (September 2011).

remedy the blight and unsafe and dangerous conditions which exist at vacant properties that were foreclosed as a result of Wells Fargo's illegal lending practices.

21.     Because of the multitude of analytic tools available to Wells Fargo to determine the likelihood that a particular mortgage loan would result in default by the borrower, as well as the existence of various studies, reports, and other pertinent literature specifically addressing the connection between mortgage loans and foreclosures, it was foreseeable that Wells Fargo knew, or should have known, that a predatory or high risk loan issued to an African-American or Hispanic in certain neighborhoods in Los Angeles would result in default and subsequent foreclosure. Moreover, because Wells Fargo maintains numerous branch offices throughout Los Angeles, and has knowledge of the specific address for each loan it issued, it was foreseeable that Wells Fargo knew, or should have known, of the condition of foreclosed properties corresponding to loans that it issued in Los Angeles, regardless of whether it serviced the loan or subsequently sold the servicing rights to a third party.

22.     According to Federal Reserve Chairman Bernanke, "foreclosures can inflict economic damage beyond the personal suffering and dislocation that accompany them.  Foreclosed properties that sit vacant for months (or years) often deteriorate from neglect, adversely affecting not only the value of the individual property but the values of nearby homes as well.  Concentrations of foreclosures have been shown to do serious damage to neighborhoods and communities, reducing tax bases and leading to increased vandalism and crime.  Thus, the overall effect of the foreclosure wave, especially when concentrated in lower-income and minority areas, is broader than its effects on individual homeowners."[8]

23.     The discriminatory lending practices at issue here have resulted in what many leading commentators describe as the "greatest loss of wealth for people of color

---

[8] Bernanke, *supra* n.4 at p. 2.

in modern US history."  It is well-established that poverty and unemployment rates for minorities exceed those of whites, and therefore, home equity represents a disproportionately high percentage of overall wealth for minorities.[9]  Indeed, between 2005-2009, the median wealth of Latino households decreased by 66 percent, and the median wealth of African-American households decreased by 53 percent, while the median wealth of white households decreased just 16 percent.[10]  As Federal Reserve Chairman Bernanke recently explained, as a result of the housing crisis, "most or all of the hard-won gains in homeownership made by low-income and minority communities in the past 15 years or so have been reversed."[11]  The resulting impact of these practices represents "nothing short of the preeminent civil rights issue of our time, erasing, as it has, a generation of hard fought wealth accumulation among African Americans."[12]

## II.    PARTIES

24.    Plaintiff City of Los Angeles is a municipal corporation, organized pursuant to Article XI of the California Constitution.  The City is authorized by the City Council to institute suit to recover damages suffered by the City as described herein.

25.    Wells Fargo & Company is a nationwide, diversified, financial services company.  Upon information and belief, its corporate headquarters are located in San Francisco, California.  It is the parent company of Wells Fargo Bank, N.A.

---

[9] Robert Schwemm and Jeffrey Taren, *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act,* 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV. 375, 382 (2010).

[10] Alliance of Californians for Community Empowerment, *California in Crisis: How Wells Fargo's Foreclosure Pipeline is Damaging Local Communities*, (2013) pg. 6 available at www.calorganize.org.

[11] Bernanke, *supra* n.4 at p. 2.

[12] Charles Nier III and Maureen St. Cyr, *A Racial Financial Crisis: Rethinking the Theory of Reverse Redlining to Combat Predatory Lending Under the Fair Housing Act*, 83 TEMPLE LAW REV. 941, 942 (2011).

26.     Wells Fargo Bank, N.A. is organized as a national banking association under the laws of the United States.  Upon information and belief, its corporate headquarters are located in South Dakota.  It maintains multiple offices in the State of California for the purposes of soliciting applications for and making residential mortgage loans, and engaging in other business activities.

27.     The Defendants in this action are, or were at all relevant times, subject to Federal laws governing fair lending, including the FHA, and the regulations promulgated under each of those laws.  The FHA prohibits financial institutions from discriminating on the basis of, *inter alia*, race, color, or national origin in their residential real estate-related lending transactions.

28.     The Defendants in this action are or were businesses that engage in residential real estate-related transactions in the City of Los Angeles, within the meaning of the FHA, 42 U.S.C. § 3605.

29.     Based on information reported pursuant to the Home Mortgage Disclosure Act, in addition to loans that Defendants originated directly, Defendants are responsible for residential home loans acquired from, and/or sold by or through, Wells Fargo Financial, Wells Fargo Financial California, Wells Fargo Funding, Inc., Wachovia Mortgage, FSB, Wachovia Bank, N.A., Wachovia Mortgage Co., World Savings Bank, FSB, American Mortgage Network, Inc., and Home Services Lending, LLC.

30.     Upon information and belief, Plaintiff alleges that each of the Defendants was and is an agent of the other Defendants.  Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies, and/or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal.  Each Defendant, in acting or omitting to act as alleged in this Complaint,

was acting through its agents, and is liable on the basis of the acts and omissions of its agents.

### III.   JURISDICTION AND VENUE

31.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613, and 28 U.S.C. §§ 1331, 1343, because the claims alleged herein arise under the laws of the United States.

32.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Wells Fargo conducts business in this District and a substantial part of the events and omissions giving rise to the claims occurred in this District.

### IV.   FACTUAL BACKGROUND

33.     Prior to the emergence of subprime lending, most mortgage lenders made only "prime" loans.  Prime lending offered uniformly priced loans to borrowers with good credit, but individuals with lower credit were not eligible for prime loans.

34.     Subprime lending developed and began growing rapidly in the mid-1990s as a result of technological innovations in risk-based pricing and in response to the demand for credit by borrowers who were denied prime credit by traditional lenders. Advances in automated underwriting allowed lenders to predict with improved accuracy the likelihood that a borrower with lower credit would successfully repay a loan.  These innovations gave lenders the ability to adjust the price of loans to match the different risks presented by borrowers whose credit records did not meet prime standards.  Lenders found that they could now accurately price loans to reflect the risks presented by a particular borrower.  When done responsibly, this made credit available much more broadly than had been the case with prime lending.

35.     Responsible subprime lending has opened the door to home ownership to many people, especially low- to moderate-income and minority consumers, who otherwise would have been denied mortgages.  At the same time, however, subprime lending has created opportunities for unscrupulous lenders to target minorities and

engage in discriminatory, irresponsible lending practices that result in loans that borrowers cannot afford.  This, in turn, leads directly to defaults and foreclosures.

36.   Enticed by the prospect of profits resulting from exorbitant origination fees, points, and related pricing schemes, some irresponsible lenders took advantage of a rapidly rising real estate market to convince borrowers to enter into discriminatory loans that had unfair terms that they could not afford.  Often this was accomplished with the help of deceptive practices and promises to refinance at a later date.  These abusive lenders did not worry about the consequences of default or foreclosure to their business because, once made, a significant number of the loans were sold on the secondary market.

37.   As the subprime market grew, the opportunities for abusive practices grew with it.  As a consequence, the federal government has found that abusive and predatory practices "are concentrated in the subprime mortgage market."[13]  These practices, which in recent years have become the target of prosecutors, legislators, and regulators, include the following:

a.   Placing borrowers in subprime loans even though they qualify for prime loans on better terms.

b.   Failing to prudently underwrite hybrid adjustable rate mortgages (ARMs), such as 2/28s and 3/27s.[14]  After the borrower pays a low "teaser rate" for the first two or three years, the interest rate on these loans resets to a much higher rate that can continue to rise based on market conditions.  Subprime lenders often underwrite these loans based only on consideration of whether the borrower can make payments

_____

[13] United States Department of Housing & Urban Development and United States Department of the Treasury, Curbing Predatory Home Mortgage Lending (2000) at 1 (*available at* http://www.huduser.org/Publications/pdf/treasrpt.pdf) ("HUD/Treasury Report").

[14] In a 2/28 ARM, the "2" represents the number of years the mortgage will be fixed over the term of the loan, while the "28" represents the number of years the interest rate paid on the mortgage will be variable.  Similarly, in a 3/27 ARM, the interest rate is fixed for three years and variable for the remaining 27-year amortization.

during the initial teaser rate period, without regard to the sharply higher payments that will be required for the remainder of a loan's 30-year term.  Irresponsible lenders aggressively market the low monthly payment that the borrower will pay during the teaser rate period, misleading borrowers into believing that they can afford that same low monthly payment for the entire 30-year term of the loan, or that they can refinance their loan before the teaser rate period expires.

          c.     Failing to prudently underwrite refinance loans, where borrowers substitute unaffordable mortgage loans for existing mortgages that they are well-suited for and that allow them to build equity.  Such refinanced loans strip much or even all of that equity by charging substantial new fees, often hiding the fact that the high settlement costs of the new loan are also being financed.  Lenders that aggressively market the ability of the borrower to pay off existing credit card and other debts by refinancing all of their debt into one mortgage loan mislead borrowers into believing that there is a benefit to debt consolidation, while obscuring the predictable fact that the borrower will not be able to repay the new loan.  The refinanced loans are themselves often refinanced repeatedly with ever-increasing fees and higher interest rates, and with ever-decreasing equity, as borrowers seek to stave off foreclosure.

          d.     Allowing mortgage brokers to charge "yield spread premiums" for qualifying a borrower for an interest rate that is higher than the rate the borrower qualifies for and can actually afford.

          e.     Failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history.  These criteria ensure that a borrower is obtaining a loan that he or she has the resources and assets to repay, and ignoring these criteria results in many loans that bear no relation to borrowers' ability to repay them.  This allows the lender to make a quick profit from the origination, but sets the borrower up for default and foreclosure.

1          f.      Requiring substantial prepayment penalties that prevent borrowers

2    whose credit has improved from refinancing their subprime loan to a prime loan.

3    Prepayment penalties not only preclude borrowers from refinancing to a more

4    affordable loan, but reduce the borrowers' equity when a subprime lender convinces

5    borrowers to refinance needlessly one subprime loan with another.

6          g.      Charging excessive points and fees that are not associated with any

7    increased benefits for the borrower.

8         38.    The problem of predatory practices in subprime mortgage lending is

9    particularly acute in minority communities because of "reverse redlining."  As used by

10   Congress and the courts, the term "reverse redlining" refers to the practice of targeting

11   residents in certain geographic areas for credit on unfair terms due to the racial or

12   ethnic composition of the area.  This is in contrast to "redlining," which is the practice

13   of denying *equal* credit opportunities to specific geographic areas because of the racial

14   or ethnic composition of the area.  Both practices have repeatedly been held to violate

15   the Federal Fair Housing Act.

16        39.    Following the onset of the subprime mortgage crisis, and after years of

17   issuing abusive home loans in minority neighborhoods, the big bank lenders began to

18   limit the issuance of mortgage credit to minority borrowers (*i.e.*, refusing to refinance

19   predatory loans).  At the same time, when the big banks did extend credit, they

20   continued to do so on predatory terms.

21       **V.    WELLS FARGO ENGAGED IN DISCRIMINATORY
                LENDING PRACTICES**

22   **A.    Wells Fargo Permits and Promotes Discriminatory Lending**

23       **1.    Wells Fargo's mortgage loan channels.**

24        40.    Between 2004 and at least 2008, Wells Fargo originated retail residential

25   home mortgage loans and purchased loans in numerous geographic markets in the

26

27

28

United States, including several hundred metropolitan areas ("MSAs"), and specifically, the Los Angeles MSA.

41.   During all or part of this time period, Wells Fargo Home Mortgage was divided into two major divisions – Retail (National Consumer Lending) and Institutional Lending ("IL"), of which Wells Fargo Wholesale Lending was a business line.  Within the retail channel, Wells Fargo had "Distributed Retail" and "Centralized Retail" lines.  The Distributed Retail line operated as a traditional retail channel that had face-to-face contact with customers in branch offices and originated both prime and subprime loans.  The subprime division of the Distributed Retail line was known as the Mortgage Resources ("MoRe") division; in early 2005, its name was changed to Home Credit Solutions ("HCS").  Loan officers within the Distributed Retail line were assigned to either the prime or MoRe/HCS divisions.  Until the two divisions were merged in 2008, no retail loan officer originated both prime and subprime loans.  The Centralized Retail line primarily handled prime loan products and operated through telephone calls and internet applications.  Wells Fargo referred to both prime and subprime loan officers in its Distributed Retail and Centralized Retail lines as "Home Mortgage Consultants" or "HMCs."  The same prime pricing policies applied to both the Centralized and Distributed Retail lines.

42.   Through its retail and wholesale channels, Wells Fargo originated virtually every type of loan product that was available in the residential lending market.  Among others, these products included:  (a) traditional prime loans (least risky); (b) subprime loans (most risky) typically designed for borrowers with credit scores or other credit characteristics deemed too weak to qualify for prime loans; and (c) "Alt-A" loans (risk level between prime and subprime loans) with application requirements or payment terms less restrictive than traditional prime loan terms or requirements, such as interest-only terms, reduced documentation requirements, or balloon payments.  Subsequent to origination, Wells Fargo sold or securitized for sale

the bulk of the loans it originated in the secondary market, either to government-sponsored entities Fannie Mae and Freddie Mac or to private investors.

43.　　Since 2008, as the data discussed below makes clear, there has been a shift in the types of loans issued – and not issued – by the Bank.  For example, the Bank shifted from offering new subprime loans toward issuing more Home Equity Lines of Credit ("HELOCs") and higher cost FHA/VA loans.[15]  FHA and VA government loans are characterized as higher risk loans because:  (1) they are typically more expensive for a borrower than conventional loans and include fees and costs not associated with conventional loans; and (2) several of the government loan programs permit negative amortization.[16]  At the same time, in the last several years, the Bank tightened lending requirements in a manner that drastically limited the ability of minority borrowers to refinance or otherwise modify the subprime loans previously issued by the Bank.

44.　　Wells Fargo applied its pricing policies on a nationwide basis, although the rate sheets followed certain state-specific requirements.

**2.　　Product Placement.**

45.　　Wells Fargo placed African-American and Hispanic borrowers into predatory loans (*e.g.*, subprime, burdensome HELOCs, more onerous/expensive terms, higher costs, etc.) even though white borrowers who had similar credit qualifications were placed into prime loans.  As a result of being placed into an illegal discriminatory loan, an African-American or Hispanic borrower paid, on average, up to tens of thousands of dollars more for a Wells Fargo loan, and was subject to

---

[15] While FHA/VA loans are not inherently predatory, these loans have higher risk features such as higher fees and higher interest rates.  When banks target minorities for FHA/VA loans and issue more of them to minorities, they are acting in a discriminatory manner.

[16] California Reinvestment Coalition, *et al.*, *Paying More for the American Dream VI, Racial Disparities in FHA/VA Lending,* (July 2012); www.fha.com/fha_loan_types; www.benefits.va.gov/homeloans.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-14  658983 V2

- 17 -

possible pre-payment penalties, increased risk or credit problems, default, and foreclosure, as well as the emotional distress that accompanies such economic pressures.  It was Wells Fargo's business practice to allow its HMCs and mortgage brokers to place an applicant in a discriminatory loan even when the applicant qualified for a prime loan according to Wells Fargo's underwriting guidelines.  Wells Fargo also gave its HMC's and mortgage brokers originating Wells Fargo loans discretion to request and grant exceptions to underwriting guidelines.  These policies and practices resulted in the placement of African-American and Hispanic borrowers into predatory loans, when similarly-situated white borrowers were placed into prime loans, both on a nationwide basis and in dozens of geographic markets across the country (including Los Angeles), where Wells Fargo originated a large volume of loans.

46.     Wells Fargo's fair lending monitoring efforts were sufficient to put it on notice of widespread product placement disparities based on race and national origin. Wells Fargo did not act to determine the full scope of these product placement disparities, nor did it take prompt and effective action to eliminate those disparities. As described in further detail below, at certain times relevant to this action, Wells Fargo had in place a system, called the "A-Paper Filter" or the "Enhanced Care Filter," whose stated purpose was ensuring that all prime-eligible borrowers were referred to the Bank's prime division.  The A-Paper Filter was highly susceptible to manipulation, because individual non-prime loan originators were responsible for entering a borrower's information into the Filter.  Further, internal Wells Fargo officers indicate that senior Wells Fargo officers were aware that the Bank's compensation structure incentivized loan originators to manipulate the data they entered into the A-Paper Filter, in order to keep prime-eligible borrowers within the subprime division.  Senior Wells Fargo officers were aware that this manipulation was in fact occurring on a systematic basis, but failed to take appropriate corrective action.

47.     Wells Fargo published underwriting guidelines that purported to establish the objective criteria an applicant had to meet in order to qualify for a particular type of loan product.  These underwriting guidelines were available to Wells Fargo's underwriters, as well as its third-party loan originators, who had entered into contracts with Wells Fargo to enable them to select loan products for individual borrowers with differing credit-related characteristics (*i.e.*, purchases made via Wells Fargo's wholesale channel).  These underwriting guidelines were intended to be used, for example, to determine whether a loan applicant qualified for a prime loan product, a referral from the prime division to the subprime division, a subprime loan product, referral to an FHA/VA loan or other special loan product, or for no Wells Fargo loan product at all.

48.     Loan terms and conditions, including prices, generally are most favorable for a borrower with a prime loan product, and least favorable for a borrower with a subprime loan product, which often included terms such as initial short-term teaser interest rates that suddenly rise to produce substantially increased and potentially unaffordable payments after two to three years, substantial pre-payment penalties, balloon payments, higher fees, and longer underwriting times.

49.     In mortgage lending commission structures, loan officers typically receive commissions in terms of "basis points," with one basis point being equivalent to 0.01% of the loan amount.  For example, from 2004 to 2005, Wells Fargo's subprime HMCs earned between 95 and 180 basis points, depending on loan amount and monthly origination volume, for originating a subprime loan.  From 2006 to 2007, subprime HMCs earned between 75 and 175 basis points, depending on loan amount, and monthly origination volume, for originating a subprime loan.  From 2004 to 2007, a subprime HMC earned only 50 basis points for referring a prime-eligible borrower to the prime division.  Accordingly, a subprime HMC lost between 25 and 130 basis points for referring a prime-eligible borrower to the prime division rather than

originating the loan as subprime.  This policy and practice created a financial incentive for HMCs to originate loans as subprime rather than prime, even when the applicant could have qualified for a prime loan.

50.    Wells Fargo's cap on the amount of total compensation that a mortgage broker could receive on an individual loan also varied, in part, based on whether the loan was a subprime product or a prime product.  From 2004 through at least 2007, total broker compensation for prime loans was capped at 4.5% (450 basis points) of the loan amount.  However, total broker compensation for subprime loans was capped at 500 basis points, giving brokers a financial incentive to originate a subprime loan where possible.  The higher cap meant, for example, that a broker originating a $300,000 loan could make $1,500 more by originating the loan as subprime rather than prime.

51.    Wells Fargo's compensation structure provided a strong incentive for HMCs and wholesale mortgage brokers to originate a loan as subprime, even if the borrower could qualify for a more favorable prime loan.  This compensation structure, combined with the substantial discretion that subprime loan originators had to qualify prime-eligible borrowers for subprime loans, resulted in discrimination on the basis of race and national origin against African-American and Hispanic borrowers.

52.    For each residential loan that Wells Fargo's HMCs and mortgage brokers originated from at least 2004, information about each borrower's race and national origin was known by, or available to, Wells Fargo.

53.    Subprime loan originators had the ability to enter incorrect information into the A-Paper Filter to prevent a borrower from being identified as prime-eligible, thereby ensuring that the loan would remain in the subprime division.  The incorrect information included, but was not limited to:  (1) stating a reduced income in order to make a borrower's debt-to-income ratio ("DTI") appear higher than it actually was; (2) omitting assets to create the appearance that a borrower had no reserves; and

(3) misstating the borrower's length of employment.  The A-Paper Filter was not capable of identifying situations wherein information was entered into the Filter incorrectly for purposes of ensuring that a loan could remain in the subprime channel.

54.     Subprime loan originators were not prohibited from encouraging prime-eligible borrowers to take steps that would disqualify them from receiving prime loans, including, but not limited to, the following:  (1) encouraging borrowers to forego providing income and/or asset documentation; and (2) encouraging borrowers to take out additional cash or forego making a down payment, thereby increasing the borrower's loan-to-value ratio ("LTV").  Internal Wells Fargo documents indicate that Wells Fargo senior managers were aware that loan originators were encouraging borrowers to take these and other steps adverse to borrowers' interests on a systematic basis.  Notably, the A-Paper Filter was not able to identify situations wherein prime-eligible borrowers were encouraged by loan originators to take steps that would disqualify them from receiving prime loans.

55.     Internal Wells Fargo audits of the A-Paper Filter identified multiple problems.  These audits indicated that data inputted into the Filter was often inconsistent with the information contained in the loan files, and that many loans were originated as subprime although no subprime qualifiers existed in the loan files.

56.     For each subprime loan that had a prepayment penalty, an interest-only feature, or reduced documentation, Wells Fargo required borrowers to sign a disclosure form, called the "Product/Feature Selection Disclosure."  This form purported to explain how these features impacted the borrower's financing, and that the borrower was receiving a subprime loan, and required the borrower to confirm that a Wells Fargo loan originator had discussed all available Wells Fargo home mortgage options with the borrower.

57.     This disclosure form was not effective in preventing loan originators from steering borrowers to the subprime division.  Wells Fargo subprime loan originators

often failed to discuss all available loan options with borrowers before having them sign the disclosure form.  Further, Wells Fargo subprime loan originators were not required to inform prime-eligible customers who received a subprime loan that they did in fact qualify for a more favorable loan.  Rather, Wells Fargo required all subprime borrowers to sign the Product/Feature Selection Disclosure, without specific knowledge as to whether they were in fact prime-eligible.

### 3.    Wholesale mortgage broker fees.

58.    Wells Fargo charged African-American wholesale borrowers higher fees and costs than white borrowers, not based on their creditworthiness or other objective criteria related to borrower risk, but because of their race.  Similarly, Wells Fargo charged Hispanic wholesale borrowers higher fees and costs than white borrowers, not based on their creditworthiness or other objective criteria related to borrower risk, but because of their national origin.  It was Wells Fargo's business practice to allow its mortgage brokers who generated loan applications through its wholesale channel to vary a loan's interest rate and other fees from the price set based on a borrower's objective credit-related factors.  This unguided and subjective pricing discretion resulted in African-American and Hispanic borrowers paying more than white borrowers with similar credit characteristics.

59.    Wells Fargo's wholesale pricing monitoring efforts, while inadequate to remedy discriminatory practices against African-American and Hispanic borrowers, were sufficient to put it on notice of widespread pricing disparities based on race and national origin.  Even when Wells Fargo had reason to know there were disparities, however, Wells Fargo did not act to determine the full scope of these wholesale pricing disparities, nor did it take prompt and effective action to eliminate those disparities.

60.    From at least 2004, Wells Fargo originated and funded residential loans of all types through its Wholesale Lending Division ("WLD").  Applications for these

loans were brought to Wells Fargo by mortgage brokers throughout the United States who entered into contracts with Wells Fargo for the purpose of bringing loan applications to it for origination and funding.

61.    Wells Fargo required prospective brokers to submit a document entitled "Intent to Act as a Broker," and to enter into a Broker Origination Agreement in order to be approved as a Wells Fargo broker.  According to Wells Fargo, the process of obtaining and maintaining approved broker status involved its careful analysis of the broker's financial condition; experience level; operational scope and operational methodology; and thorough consideration of the broker's organization, staff, organization principals, licensing, agency standing, and regulatory approvals based upon documents and information provided by the broker.

62.    Wells Fargo's brokers were required to adhere to the provisions set forth in its Wholesale Lending Broker Origination Guide, and Wells Fargo's contracts with brokers required representations and warranties that they would comply with applicable federal, state, and local laws and regulations, including fair lending requirements.  Wells Fargo required its brokers to attest that all mortgage loans submitted conformed to the Bank's applicable requirements and to all of the guidelines for a particular loan program.

63.    Wells Fargo authorized brokers to inform prospective borrowers of the terms and conditions under which a Wells Fargo residential loan product was available.  Wells Fargo did not require the mortgage brokers to inform a prospective borrower of all available loan products for which he or she qualified, of the lowest interest rates and fees for a specific loan product, or of specific loan products best designed to serve the interests expressed by the applicant.  Upon receipt of a completed loan application from a broker, Wells Fargo evaluated the proposed loan using its underwriting guidelines and determined whether to originate and fund the loan.

64.     Wells Fargo was directly and extensively involved in setting the complete, final terms and conditions of wholesale loan applications generated by mortgage brokers that Wells Fargo approved and originated.  At the time of originating each loan, Wells Fargo was fully informed of the loan terms and conditions, including the fees it passed along to brokers, and it incorporated those terms and conditions into the wholesale loans it originated.

65.     From at least 2004, Wells Fargo's policies and practices established a two-step process for the pricing of wholesale loans that it originated.  The first step was to establish a base or par rate for a particular type of loan for an applicant with specified credit risk characteristics.  In this step, Wells Fargo accounted for numerous objective credit-related characteristics of applicants by setting a variety of prices for each of the different loan products that reflected its assessment of individual applicant creditworthiness, as well as the current market rate of interest and price it could obtain for the sale of such a loan from investors.

66.     From at least 2004, Wells Fargo set terms and conditions, including interest rates, for its various home mortgage loan products available through its wholesale loan channel.  Wells Fargo accounted for numerous applicant credit risk characteristics by setting a range of prices for each of the different loan products it offered that reflected applicant creditworthiness.  It communicated these loan product prices to its brokers through rate sheets.  Wells Fargo made prime rate sheets available to brokers on a daily basis via email or the "Brokers First" website that communicated the effective date, time, and product pricing that was released with a specific price change.  The rate sheets also established price caps that limited the level of broker compensation.  According to Wells Fargo's Wholesale Pricing Policy, price changes were initiated by Wells Fargo's Capital Markets Group as a result of rate movements, or by the Wholesale Pricing Group to adjust profit expectations or alter competitive position.  Wells Fargo distributed its Traditional Nonprime rate sheets once a week.

67.     Wells Fargo's second step of pricing wholesale loans permitted mortgage brokers to set the amount of broker fees charged to individual borrowers, unrelated to an applicant's credit risk characteristics.  Mortgage brokers who supplied Wells Fargo with loan applications that Wells Fargo funded were compensated in two ways.  One was through a yield spread premium ("YSP"), an amount paid by Wells Fargo to the brokers based on the extent to which the interest rate charged on a loan exceeded the base or par rate for that loan to a borrower with particular credit risk characteristics fixed by Wells Fargo and listed on its rate sheets.  The YSP is derived from the present dollar value of the difference between the credit risk-determined par interest rate a wholesale lender such as Wells Fargo would have accepted on a particular loan and the interest rate a mortgage broker actually obtained for Wells Fargo.  Wells Fargo benefitted financially from the loans it made at interest rates above the par rates set by its rate sheets.  For those loans that it sold or securitized, higher interest rates meant sales at prices higher than it otherwise would have obtained; for loans it retained, higher interest rates meant more interest income over time.  The second way brokers were compensated was through direct fees and origination fees charged to the borrower.  Wells Fargo directed its closing agents to pay direct fees to brokers out of borrowers' funds at the loan closing.  Taken together, these two forms of compensation are referred to in this Complaint as "total broker fees."

68.     Wells Fargo had written policies placing a ceiling on total broker fees. From 2004 through at least 2009, the maximum total broker fee that a broker could earn from originating a prime Wells Fargo loan was 4.5% of the total loan amount. From 2004 through 2007, the maximum total broker fee that a broker could earn from originating a subprime Wells Fargo loan was 5.0% of the total loan amount.  Wells Fargo stopped originating subprime loans from its wholesale channel in July 2007. Wells Fargo *also* permitted pricing exceptions for reasons wholly unrelated to creditworthiness, such as customer service issues or competitive reasons, and required

approval based on the amount of the exception (*e.g.*, exceptions over $2,000 required Vice President approval).

69.   According to Wells Fargo's stated policy, screening for broker compensation caps was automated within the origination system to prevent users from generating closing documents if broker compensation exceeded the caps.  Wells Fargo maintained this pricing policy through at least April 2009.

70.   Other than these caps, Wells Fargo did not establish any objective criteria, or provide guidelines, instructions, or procedures to be followed by brokers: (a) in setting the amount of direct fees they should charge; or (b) in determining to charge an interest rate for a loan above that set by its rate sheet, which in turn determined the amount of YSP that Wells Fargo would pay the broker.  Mortgage brokers exercised this pricing discretion that Wells Fargo gave them, untethered to any objective credit characteristics, on every loan they brought to Wells Fargo for origination and funding.  Wells Fargo affirmed or ratified these discretionary pricing decisions for all the brokered loans it originated and funded.

71.   From 2004 to at least 2009, Wells Fargo was fully informed of all broker fees to be charged with respect to each individual residential loan application presented to it.  Wells Fargo also required brokers to disclose to the borrower all compensation and all other fees expected to be received by the broker in connection with the mortgage loan.  Wells Fargo required brokers to disclose their fees on the Good Faith Estimate, the HUD-1, and other disclosures as applicable.  Total broker fees raised the annual percentage rate charged on a loan, and could increase the note interest rate and the total amount borrowed.

72.   For each residential loan application obtained by mortgage brokers and subsequently funded by Wells Fargo, information about each borrower's race and national origin, and the amount and types of broker fees paid, was available to and was known by Wells Fargo.  Wells Fargo was required to collect, maintain, and report data

with respect to certain loan terms and borrower information for residential loans, including the race and national origin of each wholesale residential loan borrower, pursuant to HDMA.  12 U.S.C. § 2803.

**B.    Wells Fargo's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act**

**1.    Discriminatory lending results in a disproportionate number of foreclosures in minority areas.**

73.    Foreclosures are on the rise in many of the nation's most vulnerable neighborhoods, particularly those with substantial concentrations of minority households.  The increase appears to stem from the presence of:  (1) subprime lending in these communities; and (2) continuing discriminatory lending practices (*e.g.*, steering minorities into loan products with more onerous terms).

74.    A seminal report on foreclosure activity by Mark Duda and William Apgar documents the negative impact that rising foreclosures have on low-income and low-wealth minority communities, using Chicago as a case study.  Mr. Apgar is a Senior Scholar at the Joint Center for Housing Studies of Harvard University, and a Lecturer on Public Policy at Harvard's John F. Kennedy School of Government.  He previously served as the Assistant Secretary for Housing/Federal Housing Commissioner at the U.S. Department of Housing and Urban Development, and also Chaired the Federal Housing Finance Board. Mr. Apgar holds a Ph.D. in Economics from Harvard University.  Mr. Duda is a Research Fellow at the Joint Center for Housing Studies.  The Apgar-Duda report has continually been cited by subsequent governmental, public sector, and private sector reports due to its clarity and thoroughness with respect to the negative impact foreclosures have on lower-income and minority neighborhoods.[17]

---

[17] *See* W. Apgar, M. Duda & R. Gorey, *The Municipal Costs of Foreclosures:  A Chicago Case Study* (2005) (*available at* http://www.nw.org/network/neighborworksProgs/foreclosuresolutions/documents/2005 Apgar-DudaStudy- FullVersion.pdf).

75.     This significant report highlights the foreseeability of foreclosures arising from predatory lending practices and their attendant harm, demonstrating that such foreclosures impose significant and predictable costs on borrowers, municipal governments, and neighboring homeowners.

76.     Another report, by the Center for Responsible Lending, uses a national dataset to show that the foreclosure rate for low- and moderate-income African-Americans is approximately 1.8 times higher than it is for low- and moderate-income non-Hispanic whites.  The gap is smaller for Latinos, especially among low-income households, but even among low-income Latinos the foreclosure rate is 1.2 times that of low-income whites.  Racial and ethnic disparities in foreclosure rates cannot be explained by income, since disparities persist even among higher-income groups.  For example:  approximately 10 percent of higher-income African-American borrowers, and 15 percent of higher-income Latino borrowers, have lost their home to foreclosure, compared with 4.6 percent of higher income non-Hispanic white borrowers.  Overall, low- and moderate-income African-Americans and middle- and higher-income Latinos, have experienced the highest foreclosure rates.[18]

77.     Nearly 20 percent of loans in high-minority neighborhoods have been foreclosed upon or are seriously delinquent, with significant implications for the long-term economic viability of these communities.[19]

**2.     Minority neighborhoods are disproportionate recipients of predatory loans.**

78.     There is a substantial body of empirical evidence demonstrating the prevalence of reverse redlining in the subprime mortgage market.  These studies show that, even after controlling for creditworthiness and other legitimate underwriting

---

[18] Center for Responsible Lending, *Lost Ground, 2011:  Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/-mortgage-lending/research-analysis/*Lost-Ground-2011*.pdf).

[19] *Id.*

factors, subprime loans and the predatory practices often associated with subprime lending are disproportionately targeted at minority neighborhoods.[20]

79.    In general, as recently observed by the Federal Reserve in December 2012, both African-American and Hispanic borrowers were far more likely (in fact, nearly twice more likely) to obtain higher-priced loans than were white borrowers. These relationships hold both for home-purchase and refinance lending, and for non-conventional loans.  These differences are reduced, but not eliminated, after controlling for lender and borrower characteristics.  "Over the years, analyses of HMDA data have consistently found substantial differences in the incidence of higher-priced lending and in application denial rates across racial and ethnic lines, differences that cannot be fully explained by factors included in the HMDA data."[21]

80.    African-Americans and Hispanics were much more likely to receive subprime loans and loans with features that are associated with higher foreclosures, specifically prepayment penalties and hybrid or option ARMs.  These disparities were evident even comparing borrowers within the same credit score ranges.  In fact, the disparities were especially pronounced for borrowers with higher credit scores.  For example, among borrowers with a FICO score of over 660 (indicating good credit),

---

[20] *See* Abt Associates, *Using Credit Scores to Analyze High-Cost Lending in Central City Neighborhoods* (2008); Center for Responsible Lending, *Lost Ground, 2011:  Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/mortgage-lending/research-analysis/*Lost-Ground-2011*.pdf); Center for Responsible Lending, *Unfair Lending:  The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (2006) (*available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-Unfair_Lending-0506.pdf); Finance and Economics Discussion Series Divisions of Research & Statistics and Monetary Affairs Federal Reserve Board, Washington, D.C, *Subprime Mortgages:  What, Where, and to Whom?* (2008) (*available at* http://www.nber.org/papers/w14083.pdf?new_window=1 ); C. Reid and E. Laderman, Federal Reserve Bank of San Francisco, *The Untold Costs of Subprime Lending: Examining the Links among Higher-Priced Lending, Foreclosures and Race in California*, Presented at Brandeis University (2009) (*available at* http://iasp.brandeis.edu/pdfs/Author/reid-carolin/The%20Untold%20Costs%20of%20Subprime%20Lending%203.pdf ).

[21] Federal Reserve Bulletin, *The Mortgage Market in 2011: Highlights from the Data Reported under the Home Mortgage Disclosure Act* (Dec. 2012) (*available at* http://www.federalreserve.gov/pubs/bulletin/2012/PDF/2011_HMDA.pdf).

African-Americans and Latinos received a high interest rate loan more than three times as often as white borrowers.[22]

81.    In addition to receiving a higher proportion of higher-rate loans, African-Americans and Latinos also were much more likely to receive loans with other risky features, such as hybrid and option ARMs and prepayment penalties.  Disparities in the incidence of these features are evident across all segments of the credit spectrum.

82.    A 2010 Report from the California Reinvestment Coalition finds:  "[The] hardest-hit communities are racially concentrated, low to moderate income areas of African-Americans and Latinos that were saturated with high-cost, subprime lending since 2000.  Neighborhoods once redlined – where lenders refused to lend in neighborhoods of color without regard to the actual financial qualifications of residents – were flooded in the past decade with high-cost subprime loans and abusive option ARM loans.  These loans were often unaffordable and unsustainable for working class families, and inevitably led to large scale foreclosures.  In the past two years, borrowers and communities struggling to preserve their primary asset – their home – have found that banks are not willing to work with them to restructure their mortgages or to offer new loans."[23]  Key findings from the 2010 Report include:

(a)    55% of all of Wells Fargo's high-cost loans were made in minority neighborhoods in Los Angeles.

(b)    In 2008, minority neighborhoods contained roughly 63% of the housing in Los Angeles, but suffered over 90% of the City's foreclosures.

(c)    While predatory and fraudulent lending helped precipitate the foreclosure crisis, a wave of a resetting option ARM loans threatens to keep California immobilized by foreclosure beyond 2010.

---

[22] Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/-mortgage-lending/research-analysis/*Lost-Ground-2011*.pdf).

[23] California Reinvestment Coalition, *From Foreclosure to Re-Redlining,* at 1 (2010) (*available at* http://www.calreinvest.org/system/resources/.../Foreclosure_to_Re_Redlining.pdf).

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-14  658983 V2

- 30 -

(d) California cities are more likely than the national average to be saturated with low documentation loans (*e.g.*, stated income loans).  In Los Angeles, 74% of all loans in the sample were made with limited documentation, as compared to only 56% for all loans in the sample.

(e) Minority neighborhoods saw a dramatic decrease in lower cost prime loans in 2008.  The drop off from 2006 to 2008 was stunning.  In Los Angeles, less than 1/3rd as many prime loans were made available by big bank lenders in minority neighborhoods in 2008, as compared to 2006.

(f) In 2008, nearly one out of two African-Americans and Latinos seeking a home loan or refinance were denied, as compared to only about one in four whites.

(g) Even though high-cost lending began to decrease significantly by 2008, when it occurred, it was still more likely to occur in minority neighborhoods as compared to white neighborhoods.  The big bank lenders still were more than twice more likely to sell subprime loans in minority neighborhoods in Los Angeles, as compared to white neighborhoods.

(h) In many cases, minority borrowers were overburdened not only by subprime lending but by other onerous loan terms, such as prepayment penalties, yield spread premiums, option ARMs, and HELOCs, all of which have been conducive to foreclosures.

(i) In a March 2009 survey, two-thirds of housing counselors reported that they believed borrowers of color were receiving worse foreclosure prevention outcomes than white borrowers.

(j) In the wake of the subprime meltdown, as underwriting tightened for all loans, higher cost FHA mortgage loans were the "only game in town" left for many new homebuyers.

83. A 2011 Report from the California Reinvestment Coalition further found that between 2008 and 2009, in Los Angeles, the number of conventional refinance loans made in predominantly white neighborhoods more than doubled (increasing by

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-14  658983 V2

- 31 -

about 200%), while conventional refinance loans declined in the City's minority neighborhoods where such refinancing was most desperately needed.[24]

84.    At the same time that conventional credit has contracted, FHA lending has expanded dramatically.  During the subprime boom, FHA lending fell as subprime lenders targeted minority communities.  Now, with little or no subprime lending, and conventional credit restricted, FHA lending has shot up.  Overall, the share of loans with government backing went from 5% in 2005 to 26.6% in 2010.[25]

85.    For African-Americans, the share of mortgages used to purchase a home and backed by a government program increased to almost 80% in 2010; for Latinos the share increased to 73%.  But for whites, the share increased to only 49%.  At present, most minority borrowers cannot gain access to the conventional mortgage market, and instead, are relegated to more expensive FHA loans.[26]

86.    A 2012 Report from the California Reinvestment Coalition "shows that black and Latino borrowers and borrowers in communities of color received government-backed loans – insured by the Federal Housing Administration (FHA) or guaranteed by the Department of Veterans Affairs (VA) – significantly more often than did white borrowers.  The findings indicate persistent mortgage redlining and raise serious concerns about illegal and discriminatory loan steering. . . . [T]he report shows a pattern of two-tiered lending, in which borrowers and communities of color received disproportionately fewer conventional mortgages and disproportionately more government-backed loans than did white borrowers and communities. . . . [T]he disproportionate prevalence of FHA loans in communities of color raises fair lending

---

[24] California Reinvestment Coalition *et. al.*, *Paying More for the American Dream V:  The Persistence and Evolution of the Dual Market* (2011) *(available at* http://www.community-wealth.org/sites/clone.community-wealth.org/files/downloads/report-crc-et-al.pdf).

[25] Center for Responsible Lending, *The State of Lending in America & its Impact on U.S. Households,* at 44 (2012) *(available at* http://www.responsiblelending.org/state-of-lending/State-of-Lending-report-1.pdf).

[26] *Id.* at 45.

flags."  In particular, the 2012 Report observes that:  "In Los Angeles, homebuyers in neighborhoods of color received government-backed loans five times more often than did those in predominantly white neighborhoods. . . . [H]omeowners in communities of color received FHA or VA refinance loans 6.5 times more often than did homeowners in predominantly white neighborhoods."[27]  As discussed above, these government loans often have higher interest, fees, and costs than conventional loans.

### 3.     Statistical analyses conducted by the United States Department of Justice of data for loans originated by Wells Fargo showed a disparate impact on minority borrowers.

#### a.     Minority borrowers were more likely than whites to receive subprime loans.

87.     Statistical analyses conducted by the United States Department of Justice of loan data for prime and subprime wholesale loans originated by Wells Fargo just for the time period of 2004 to 2008 demonstrate that, measured on a nationwide basis after controlling for major risk-based factors relevant to determining loan product placement, including credit history, LTV, and DTI, African-American and Hispanic borrowers remained more likely to receive subprime loans from 2004 to 2008 than similarly-situated whites.  This demonstrates a pattern of statistically significant[28] differences between African-American and white borrowers with respect to their product placement by Wells Fargo.  These statistically significant disparities existed in numerous geographic markets across the nation as well.

88.     For the combined time period of 2004 to 2008, nationwide, the odds that an African-American borrower who obtained a wholesale loan from Wells Fargo

---

[27] California Reinvestment Coalition, *Paying More for the American Dream VI: Racial Disparities in FHA/VA Lending* (2012) (*available at* http://calreinvest.org/system/resources/W1siZiIsIjIwMTIvMDcvMTgvMTZfMzVfMj NfMV9wYXlpbmdtdb3JlVklfbXVsdGlzdGF0ZV9qdWx5MjAxMl9GSU5BTC5wZGY iXV0/payingmoreVI_multistate_july2012-%20FINAL.pdf).

[28] Statistical significance is a measure of probability that an observed outcome would not have occurred by chance.  As used in this Complaint, an outcome is statistically significant if the probability that it could have occurred by chance is less than 5%.

would receive a subprime loan rather than a prime loan were approximately 2.9 times as high as the odds for a similarly situated white borrower, after accounting for the same factors.  For the same time period, the odds that an African-American borrower who obtained a retail loan from Wells Fargo would receive a subprime loan rather than a prime loan were approximately 2.0 times as high as the odds for a similarly-situated white borrower, after accounting for the same factors.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers with respect to their product placement by Wells Fargo, even after accounting for objective credit qualifications.

89.    For the combined time period of 2004 to 2008, nationwide, the odds that a Hispanic borrower who obtained a wholesale loan from Wells Fargo would receive a subprime loan instead of a prime loan were approximately 1.8 times as high as the odds for a similarly-situated white borrower, after accounting for the same factors.  During the same time period, the odds that a Hispanic borrower would receive a subprime retail loan rather than a prime retail loan were approximately 1.3 times as high as the odds for a similarly-situated white borrower, after accounting for the same factors.  These odds ratios demonstrate a pattern of statistically significant differences between Hispanic and white borrowers with respect to their product placement by Wells Fargo, even after accounting for objective credit qualifications.

90.    The disparate placement of both African-Americans and Hispanic borrowers whom Wells Fargo determined had the credit characteristics to qualify for a home mortgage loan into subprime loan products, when compared to similarly-situated white borrowers, resulted from the implementation and interaction of Wells Fargo's policies and practices that:  (a) permitted Wells Fargo subprime loan originators to place an applicant in a subprime loan product even if the applicant could qualify for a prime loan product; (b) provided a financial incentive to Wells Fargo subprime loan originators to place loan applicants in subprime loan products; (c) did not require

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-14  658983 V2

- 34 -

Wells Fargo subprime loan originators to justify or document the reasons for placing an applicant in a subprime loan product even if the applicant could qualify for a prime loan product; (d) did not require Wells Fargo subprime loan originators to notify subprime loan applicants when they did in fact qualify for a more favorable loan product; and (e) failed to monitor these discretionary practices to ensure that borrowers were being placed in loan products on a nondiscriminatory basis.

91.    Wells Fargo's policies or practices were not justified by business necessity or legitimate business interests.  There were less discriminatory alternatives available to Wells Fargo that would have achieved the same business goals as these policies and practices.

92.    As early as 2005, Wells Fargo's senior officers had knowledge that its lending policies and practices resulted in the placement of prime-qualified minority applicants in subprime rather than prime loan products, and that its A-Paper Filter was ineffective.  For example, an internal Wells Fargo document from 2005 sent from a Wells Fargo Vice President of Retail Underwriting, National Programs to a number of senior and executive vice presidents revealed concerns about A-Paper Filter manipulation, and listed various tactics that subprime originators routinely employed to keep loans in the subprime division, rather than sending them to the prime channel. Another internal Wells Fargo document from 2005 concluded that loans were being originated as subprime, even though the borrowers had prime characteristics. Nonetheless, Wells Fargo continued to implement those policies and practices, and did not take effective action to change the discriminatory policies or practices to eliminate their discriminatory impact.  Nor did it act to identify or compensate the individual borrowers who were victims of its discriminatory product placement policies or practices.

**b.    Minority borrowers were more likely than white borrowers to pay higher broker fees and costs.**

93. Statistical analyses of data kept by Wells Fargo on its wholesale loans between 2004 and 2008 demonstrate statistically significant discriminatory pricing disparities in both prime and subprime loans based on both race (African-American) and national origin (Hispanic). These disparities existed both at the national level and in numerous geographic markets across the country.

94. Measured on a nationwide basis, in each year between 2004 and 2008, Wells Fargo charged African-American borrowers whom Wells Fargo determined had the credit characteristics to qualify for a home mortgage loan more in total broker fees for prime wholesale loans than white borrowers. The annual total broker fee disparities ranged up to 78 basis points, and they are statistically significant.

95. Measured on a nationwide basis in each year between 2004 and 2008, Wells Fargo charged Hispanic borrowers whom Wells Fargo determined had the credit characteristics to qualify for a home mortgage loan more in total broker fees for prime wholesale loans than white borrowers. The annual total broker fee disparities ranged up to 55 basis points, and they are statistically significant.

96. Measured on a nationwide basis in each year between 2004 and 2007, Wells Fargo charged African-American borrowers whom Wells Fargo determined had the credit characteristics to qualify for a home mortgage loan more in total broker fees for subprime wholesale loans than white borrowers. The annual total broker fee disparities ranged up to 53 basis points, and they are statistically significant.[29]

97. In setting the terms and conditions for its wholesale loans, including interest rates, Wells Fargo accounted for individual borrowers' differences in credit risk characteristics by setting the prices shown on its rate sheets for each loan product for borrowers with specified credit qualifications. These adjustments based on credit risk characteristics were separate from and did not control for either component of the

---

[29] Due to major changes in the housing market, Wells Fargo ceased subprime wholesale lending in July 2007, but its pattern or practice of discriminatory lending continued as detailed herein.

total broker fees – the interest rate deviations that Wells Fargo's policy allowed mortgage brokers to make from the par prices, which already fully accounted for borrower risk according to Wells Fargo's own standards, nor the amount of brokers' direct fees that were driven by a borrower's credit risk factors.  The race and national origin total broker fee disparities described above are not adjusted for borrowers' credit risk characteristics; Wells Fargo reviewed these broker fees, and then authorized its brokers to charge them to borrowers in the loans it originated and funded.

98.    The statistically significant race and national origin-based disparities in broker fees for African-Americans and Hispanics resulted from the implementation and interaction of Wells Fargo's policies and practices that:  (a) included pricing terms based on the subjective and unguided discretion of brokers in setting broker fees, not based on borrower risk, in the terms and conditions of loans that Wells Fargo originated after par rates had been established by reference to credit risk characteristics; (b) created a financial incentive for brokers to charge interest rates above the par rates that Wells Fargo had set; (c) did not require mortgage brokers to justify or document the reasons for the amount of broker fees not based on borrower risk; and (d) failed to adequately monitor for, and fully remedy, the effects of racial and ethnic disparities in those broker fees.  Broker fees specifically measure the pricing variation caused by the subjective and unguided pricing adjustments not based on borrower risk.  Wells Fargo continued to use these discretionary wholesale broker fee pricing policies, to document and review inadequately the implementation of that pricing component, and to incentivize upward broker adjustments to the par interest rate at least through the end of 2008.

99.    Wells Fargo's policies and practices identified above were not justified by business necessity or legitimate business interests.  There were less discriminatory alternatives available to Wells Fargo that would have achieved the same business goals as these policies and practices.

100.   Wells Fargo had knowledge that the unguided and subjective discretion it granted to mortgage brokers in its wholesale pricing policies and practices was being exercised in a manner that discriminated against African-American and Hispanic borrowers, but continued to implement its policies and practices with that knowledge. Wells Fargo did not take effective action to change the broker fee policies and practices to eliminate fully their discriminatory impact.  Wells Fargo did not act to identify or compensate any individual borrowers who were victims of its discriminatory wholesale pricing policies and practices.

**C.     Wells Fargo Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act, as Demonstrated by Former Bank Employees**

101.   Confidential Witnesses ("CWs") are former Wells Fargo employees responsible for making and/or underwriting loans on behalf of Wells Fargo in the greater Los Angeles region.  CWs describe how Wells Fargo has targeted minorities and residents of minority neighborhoods in and around Los Angeles for predatory lending practices.

102.   CW1 worked as a Private Mortgage Banker for Wells Fargo in Southern California from 2004 to 2006.  He underwrote and closed loans and was authorized to approve certain loans, generally "vanilla" or near-prime loans.  He directly observed loan officer activities in the subprime division and how loans were handled by subprime loan officers at Wells Fargo.  According to CW1, Wells Fargo steered customers in Los Angeles into making bad loan choices, Wells Fargo violated internal lending guidelines, and Wells Fargo lied to borrowers.

103.   CW2 worked as a contract underwriter for Wells Fargo (and others) from 2009 to 2012.  CW2 reviewed loan applications in the greater Los Angeles area and observed that, in the past few years, Wells Fargo has imposed strict lending guidelines that prevent minority applicants from refinancing out of bad loans.

104.   CW3 worked at Wells Fargo as a loan consultant from 2002-2004.  While at Wells Fargo, she worked in a branch office in Southern California marketing loans throughout Los Angeles at churches, festivals, and other events.  She primarily sold prime loans, but also referred customers to the Bank's MoRe division, which marketed subprime loans.  CW3 was familiar with the loans and lending practices of the MoRe division.

105.   The Bank's MoRe division marketed loans with higher interest rates and costs, which took the form of "points" on the loan.  "There were the points, and then of course, they had all their other processing-type fees they would add," CW3 said.

106.   CW4 worked for Wells Fargo from 2000 to 2010, starting as a loan account representative, then assistant branch manager, and then branch manager in the City of Los Angeles.  His branches were located in neighborhoods with large Hispanic populations.  While he did not directly supervise mortgage loan officers, his day-to-day contact with loan officers and shared customer base made him very familiar over the course of his career with the Bank's lending practices.

107.   CW5 was employed by Wells Fargo as a loan consultant in Los Angeles County from 2010 to 2011.  She worked with the Bank's customers throughout the County, including minority customers in the City of Los Angeles who sought new home loans or refinancing of existing loans.

108.   CW6 was a Home Mortgage Consultant, Sales Manager and top subprime loan officer at Wells Fargo.  She was invited to participate in a number of sales and marketing meetings with upper-level management.  A number of other loan officer representatives and personnel from around the country attended these meetings as well.  As a result, while she was employed by the Bank in Maryland, she was aware that the Bank's discriminatory lending practices took place nationally.  Similarly, she was aware that the Bank's compensation and pricing policies were applied on a nationwide basis.

**1.    Wells Fargo targets minorities for predatory loan terms.**

109.    The CWs explain that Wells Fargo targeted minorities in Los Angeles in various ways.  One was by targeting its predatory products to predominantly minority neighborhoods in Los Angeles.  According to CW1, Wells Fargo targeted low-income neighborhoods with high minority populations, such as Eagle Rock, Silver Lake, and East Los Angeles (among others).  In particular, CW1 observed that Wells Fargo heavily marketed its first-time homebuyer programs in low-income minority neighborhoods.  "That was pushed heavy, heavy in lower-income neighborhoods . . . They steered more into subprime lending," he said.

110.    According to CW1, Wells Fargo incentivized sales agents through the pay system to sell subprime loans over conventional loans.  "Steering was rampant," since it was a higher commission paid on subprime" (often substantially higher), plus bonuses for meeting or exceeding quotas.

111.    CW3 explained that Wells Fargo frequently marketed its mortgage lending services to minority churches and at other minority community events.  CW3 attended some events alongside one of Wells Fargo's Hispanic loan officers to conduct bilingual marketing.  "There was no limit to what you could do to drum up business."

112.    CW3 recalled that loan officers targeted certain neighborhoods or zip codes.  Moreover, the "Emerging Markets Group," she noted, "was specifically targeting minorities."  While she didn't view it as a predatory thing at the time, CW3 observed that "the goal was to target our marketing" and get minorities into homes.

113.    Hispanics, "especially," were seen as presenting "so much opportunity because there were so few who were in houses," CW3 said.  Loan officers would routinely place 2 to 3 people on a loan to ensure that there was adequate income to qualify.  "I would work with them to get them ready, even if we had to put 2 to 3 people on a loan so they could buy a house," CW3 said.  She recalled borrower's

saying things like, "Let me go get my cousin, then we'll get my other cousin...." CW3 described one program – "It was called '125' or something like that" – which allowed a borrower to document some portion of his income, then state 25% more.  "It took into account what they used to call 'mattress money,'" CW3 explained. This allowed "Hispanics or other minorities" to obtain loans based on income they received for jobs that they could not document.  "That's what we believed that was for," she said.

114.   In retrospect, CW3 felt that some of these efforts probably took advantage of minorities who were ill-informed of the borrowing risks.  "I think that with regard to the individuals that didn't know [what they were getting into], there should have been some additional cautions that were given to them – as opposed to just making the loans."  CW3 said she felt there should have been a greater emphasis on educating borrowers on what they were getting into – or stopping them from taking out loans they couldn't afford.  CW3 said many of her colleagues did not do this, but it should have been a requirement at Wells Fargo.  "That kind of thing should have been in place, especially if the loan officer knew the person was not able to manage that particular payment.  Because in some cases, the payment(s) well exceeded that individual's real income," she said.  CW3 added:  "I mean, why would you make a loan to a person who could not pay a $25-per-month bill on time?"  CW3 said she encountered such customers – and saw them obtain financing from Wells Fargo – very frequently.

115.   According to CW4, in addition to paying bonuses for loans, Wells Fargo rewarded their top-performing loan officers with things like tickets to sporting events such as L.A. Dodgers games and group vacations to places like Catalina Island or Miami.

116.   CW4 explained that Well Fargo printed marketing materials in foreign languages, including Spanish, to attract minority customers in the City of Los Angeles

and surrounding areas.  He also noted that the Bank would mark certain cultural holidays, such as Cinco de Mayo, with posters that pictured a mariachi band.  "We worked a lot with the Mexican consulate," he added, in the course of hosting neighborhood events.  In the earlier years, cold calling customers was another strategy for drumming up loan business, especially among minorities, although that was discontinued when federal laws were changed to prohibit it, he said.

117.  "I would say there was (targeting of minorities by Wells Fargo)," CW4 said.  "You do hear the stories and stuff."  He explained that the Bank's lending practices seemed designed to take advantage of customers who were not financially savvy.  He said borrowers often failed to understand the financial consequences of purchasing a home, in part because the Bank's loan officers often failed to explain these consequences in a way that would prepare buyers.

118.  More generally, CW5 also confirmed that loan consultants at Wells Fargo were paid commissions on completed loans, with a "draw" against commissions.

119.  According to CW6, Wells Fargo also targeted minority churches and their congregations for subprime loans.  Wells Fargo did not target white churches – "[w]hen it came to marketing, any reference to 'church' or 'churches' was understood as code for African-American or black churches."

120.  Wells Fargo even assigned employees to make presentations at the churches on the basis of race.  During a conference call in 2005 with subprime loan officers and branch managers about making presentations to black churches, the loan officers were told that only employees "of color" could attend, said CW6.  She was later told that she could come, but only if she "carried someone's bag."

121.  Wells Fargo also targeted African-Americans for subprime loans through a variety of special events, according to CW6.  Wells Fargo selected employees to make presentations at these events on the basis of race, as it did with church presentations.  One such event was a "'wealth building' seminar" designed to promote

subprime products in 2005, where the audience was expected to be predominantly African-American.  CW6 was told by the manager of Emerging Markets, a subprime unit that targeted African-Americans, that she was "too white" to appear before the audience at the seminar.  She complained to higher management, but received no response and no action was taken.

### 2. Wells Fargo gives its employees discretion to steer people who qualify for conventional mortgages into discriminatory mortgages (and pays its employees more for doing so).

122.    The CW statements demonstrate that Wells Fargo steered borrowers who qualified for prime loans into subprime loans.

123.    CW1 observed that Wells Fargo agents routinely failed to tell customers that they qualified for a lower rate, and instead steered them into a higher rate.  The higher rate earned the agent a higher commission, but this fact was never disclosed to the customer, he said.  CW1 emphasized that Wells Fargo preyed on "unsophisticated borrowers."

124.    CW3 estimated that only about 10% of customers who obtained financing through Wells Fargo's MoRe division were savvy enough to understand what they were getting into "because if they understood, I don't believe they would have accepted the loans."  CW3 also understood that non-minority loan officers had been referring minorities to the MoRe division even though those borrowers could have qualified for standard, prime loans.  "I heard there were some non-minority loan officers that would routinely refer minorities to the MoRe division even when they didn't have to go there."

125.    According to CW3, Wells gave broad discretion to its loan consultants to set costs for individual loans.  There was a cap on costs that could not be exceeded (*e.g.*, 2% points for standard loans), but the cap was higher for subprime lending.  Some loan officers would, without consulting or alerting the borrower, add points just to get the interest rate down and the costs up, without exceeding the cost cap, CW3

said.  "Some loan officers just arbitrarily added them to get to the lowest rate possible without exceeding the maximum," she said.  In addition, CW3 commented that she would receive 25% to 50% of the commission on referrals she made to the MoRe division.

126.   According to CW6, the Bank's commission and fee structure gave A rep loan officers a financial incentive to refer loans to a subprime loan officer.  Her job was to figure out how to get the customer into a subprime loan.  She knew that many of the referrals she received could qualify for a prime loan, and the Bank's underwriting guidelines left ample discretion to figure out how to qualify most referrals for a subprime loan.  Even after Wells Fargo began limiting the amount of loan fees, loan officers still had discretion and a big financial incentive to offer higher-cost loans because doing so increased their commissions.

**3.     Wells Fargo underwrites adjustable rate loans that borrowers cannot afford.**

127.   Wells Fargo frequently originates "3/27" adjustable rate mortgages, and frequently originated "2/28" adjustable rate mortgages until mid-2007, to borrowers from predominantly minority neighborhoods in Los Angeles.  Unless properly underwritten, such loans are destined to fail.

128.   Wells Fargo does not properly underwrite these loans when made to minorities and in minority neighborhoods.  Wells Fargo does not adequately consider the borrowers' ability to repay these loans, especially after the teaser rate expires and the interest rate increases.  The fact that these loans would result in delinquency, default, and foreclosure for many borrowers was, or should have been, clearly foreseeable to Wells Fargo at the time the loans were made.

129.   Similarly, CW1 observed that Wells Fargo loan officers would convince customers to roll up unsecured debt in adjustable rate mortgages. But the banks intentionally misled the customers about the potential negative effects, he said.

130.   CW3 confirmed that the Bank's loans through the MoRe division included 3-year interest-only options.

131.   The use of "2/28" and "3/27" adjustable rate mortgages in the manner described above is consistent with the practice of reverse redlining, has subjected minority borrowers to unfair and deceptive loan terms, and has contributed significantly to the high rate of foreclosure found in the minority neighborhoods of Los Angeles.

**4.    Wells Fargo limits the ability of minority borrowers to refinance out of the same predatory loans that they previously received from the Bank.**

132.   The CW2 statements confirm that Wells Fargo effectively prevents minority borrowers from refinancing out of bad loans.  CW2 reviewed loan applications within the greater Los Angeles area that he believed were qualified based on the borrowers' financial profile, but Wells Fargo instructed him to deny such loan applications.  In CW2's view, Wells Fargo began imposing strict lending guidelines that prevented minority applicants from refinancing out of bad loans.

133.   Since 2010, CW2 saw a dramatic decrease in the ratio of minorities who were being approved for loans at Wells Fargo.  "I did not see a lot of minority loans being approved.  Most of the loans coming across my desk were Caucasian, but not a lot of Hispanic or African-American.  Most of the loans I was approving were white." He said he believed minorities were hit particularly hard by the new stricter guidelines for loan approvals.  Wells Fargo "changed the rules" on these borrowers, since the bank would no longer qualify them to refinance out of the same sorts of loans that the bank previously pushed on them.

134.   CW4 agrees that the Bank imposed stricter lending requirements towards the latter part of his career (*e.g.*, 2008-2010).

### 5.   Wells Fargo engages in other abusive lending practices.

135.   The CWs further demonstrate that Wells Fargo loan officers engaged in other abusive lending practices at the expense of minority borrowers.

136.   CW1 said Wells Fargo loan officers would often doctor credit histories in order to qualify a customer for a first time home loan.  He observed that Wells Fargo typically approved loans based on exceptions to their written lending guidelines. "There were zillions of loans that should never have been approved according to what was written in their guidelines," he said.

137.   In addition, CW1 said Wells Fargo loan officers would convince customers to roll high-interest credit cards and other unsecured debt into HELOCs. But they didn't explain it to the borrower, he said.  They just told them, for example, "they'd save on their monthly payment, and that was good, because they'd need extra money to buy some furniture and pay moving expenses, et cetera," he said.

138.   CW3 said she was constantly surprised by how easy it was for customers with extremely poor credit to obtain financing.  "It was so unbelievable to me the things that I could get done," she said. "I would say, no that's never gonna fly, and in some cases I would make the recommendation or the referral, and it would happen. … You have a person who's never paid a bill, and you give them a loan."

139.   CW4 said Wells Fargo loan officers and personal bankers promoted HELOCs as a solution to debt (debt consolidation) for things such as medical bills, living expenses, and new car payments.  Mortgage loan officers and regular bankers at the branches could write these loans – and did, according to CW4.  Wells Fargo offered significant bonuses to its bank employees for closing such loans.  "It would bring them a lot of incentives, payouts from the bank," he said.  Bonuses were awarded through a point-based system and calculated based on both the number of loans and size of loans written.  Home equity loans were seen as a great way to earn

bonuses.  Good bankers knew how to "max out" such loans, based on a customer's financial situation, he said.

140.   According to CW4, borrowers who had family members living in their houses were encouraged to inflate their income when applying for home equity loans by generating a document that said those family members paid a certain amount in rent.  "Let's say you own a property, and you want to do that type of loan (home equity loan).  What they would ask for, let's say you have a family member living in your home.  Even though they were not paying you rent, you would come up with some sort of paper document saying so-and-so pays me so much. … That would be the kind of stuff that I saw that did occur, other than also bringing in additional family members to co-sign."

141.   CW4 explained that the Bank encouraged borrowers who did not have sufficient income or assets to obtain a loan to bring in additional family members and other families who might all be living together to sign for a single loan.  "I'd see that a lot" with minority customers, he said.  He even recalled seeing as many as three families, for a total of six signatures, signed to a single mortgage loan.

142.   CW4 also said that borrowers were sometimes told their interest rate was "locked" when it wasn't.  "They were given a particular rate, then the loan rep would say, 'I'm sorry…the rate is actually this much.'"

143.   CW5 observed that FHA loans and small loans (*e.g.*, less than $100,000) at Wells Fargo typically came with higher costs (*i.e.*, more points) when compared to larger conventional loans offered by the Bank.

**D.   Minorities in Fact Receive Predatory Loan Terms from Wells Fargo**

144.   As discussed herein, Wells Fargo's *predatory* loans include:  high-cost loans (*i.e.*, loans with an interest rate that was at least three percentage points above a federally-established benchmark), subprime loans, interest-only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no

1    documentation loans, and/or ARM loans with teaser rates (*i.e.*, lifetime maximum rate

2    > initial rate + 6%).

3         145.   Data reported by the Bank and available through public databases shows

4    that in 2004-2011, 9.6% of loans made by Wells Fargo to African-American and

5    Latino customers in Los Angeles were high cost, but only 2.6% of loans made to white

6    customers in Los Angeles were high cost.  This data demonstrates a pattern of

7    statistically significant differences in the product placement for high cost loans

8    between minority and white borrowers.[30]

9         146.   The following map of Wells Fargo predatory loans originated in Los

10   Angeles between 2004-2011 illustrates the geographic distribution of predatory loans

11   in African-American and Latino neighborhoods and white neighborhoods in Los

12   Angeles.  This map demonstrates that Wells Fargo's predatory loans are

13   disproportionately located in minority neighborhoods.

---

[30] As alleged throughout the complaint, all references to the date range 2004-2011 are intended to include the time period up to and including December 31, 2011.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT                   - 48 -
010346-14  658983 V2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16      147.   The fact that predatory loans involving all of Wells Fargo's loan products

17 are more heavily concentrated in minority neighborhoods in Los Angeles is consistent

18 with the practice of reverse redlining and, upon information and belief, has contributed

19 significantly to the disproportionately high rates of foreclosure in minority

20 communities in Los Angeles.

**E.      Minorities in Los Angeles Receive Such Predatory Loan Terms from Wells**
21 **       Fargo Regardless of Creditworthiness**

22      148.   According to *Discretionary Pricing, Mortgage Discrimination, and the*

23 *Fair Housing Act*, 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV. 375, 398

24 (2010), several studies dating back to 2000 have established that minority borrowers

25 were charged higher interest rates/fees than similar creditworthy white borrowers.

26      149.   Likewise, according to *A Racial Financial Crisis*, 83 TEMPLE LAW REV.

27 941, 947, 949 (2011), one study concluded that "[e]ven after controlling for

28

underwriting variables, African-American borrowers were 6.1% to 34.3% more likely than whites to receive a higher rate subprime mortgage during the subprime boom." And another study found that significant loan pricing disparity exists among low risk borrowers – African-American borrowers were 65% more likely to receive a subprime home purchase loan than similar creditworthy white borrowers, and 124% more likely to receive a subprime refinance loan.[31]

150. Similarly, the Center for Responsible Lending's November 2011 report, *Lost Ground, 2011:  Disparities in Mortgage Lending and Foreclosures,* at 21-22, stated that "racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes."  Further, the Center stated it is "particularly troublesome" that minorities received riskier loans "even within [similar] credit ranges."  For example, among borrowers having FICO scores above 660, the incidence of higher rate loans among various groups was as follows:  whites – 6.2%; African-American – 21.4%; and Latino – 19.3%.

151. Moreover, data reported by the Bank, and available through both public and private databases, shows that minorities in Los Angeles received predatory loan terms from Wells Fargo more frequently than white borrowers regardless of creditworthiness.

152. A regression analysis of this data, controlling for borrower race and objective risk characteristics such as credit history, loan-to-value ratio, and the ratio of loan amount to income demonstrates that, from 2004-2011, an African-American borrower was 2.078 times more likely to receive a predatory loan as was a white borrower possessing similar underwriting and borrower characteristics.  The regression analysis further demonstrates that the odds that a Latino borrower would receive a predatory loan were 1.548 times the odds that a white borrower possessing

---

[31] Center for Responsible Lending, *Unfair Lending:  The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (2006) (internal citation omitted) (*available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-Unfair_Lending-0506.pdf)

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-14  658983 V2

- 50 -

similar underwriting and borrower characteristics would receive a predatory loan. These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

153.   The regression analysis also shows that these disparities persist when comparing only borrowers with FICO scores above 660.  An African-American borrower with a FICO score above 660 was 2.124 times more likely to receive a predatory loan as was a white borrower with similar underwriting and borrower characteristics.  A Latino borrower with a FICO score above 660 was 1.613 times more likely to receive a predatory loan as was a white borrower with similar underwriting and borrower characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

154.   A similar regression analysis, taking into account the racial makeup of the borrower's neighborhood rather than the individual borrower's race, shows that borrowers in heavily minority neighborhoods in Los Angeles were more likely to receive predatory loans than borrowers in heavily white neighborhoods.  For example, a borrower in a heavily minority census tract (census tract consisting of at least 80% African-American or Latino households) was 2.946 times more likely to receive a predatory loan as was a borrower with similar characteristics in a heavily white neighborhood (census tract with at least 80% white households).  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

155.   This data also establishes that Wells Fargo disproportionately issued government loans with higher risk features (FHA/VA) to African-American and Latino borrowers in Los Angeles from 2009-2011.  A regression analysis, controlling for borrower race and objective risk characteristics such as ratio of loan amount to income, demonstrates that an African-American borrower was 5.530 times more likely

to receive a higher risk government loan than was a white borrower possessing similar borrower and underwriting characteristics.  The regression analysis further demonstrates that a Latino borrower was 3.752 times more likely to receive a higher risk government loan than was a white borrower possessing similar borrower and underwriting characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

156.   Thus, the disparities are not the result of, or otherwise explained by, legitimate non-racial underwriting criteria.

**F.    Wells Fargo's Targeting of Minorities who in Fact Receive Predatory Loan Terms Regardless of Creditworthiness Causes Foreclosures**

**1.    Data shows that Wells Fargo's foreclosures are disproportionately located in minority neighborhoods in Los Angeles.**

157.   Wells Fargo's failure to underwrite mortgage loans in minority and underserved communities in a responsible manner has been the subject of public attention and concern for years.  For example, its practices are the focus of a 2004 report from the Center for Responsible Lending.  The report concluded that Wells Fargo's customers "too often face the loss of their home or financial ruin as a result" of its "predatory practices."[32]  The predatory practices identified in the report include charging excessively high interest rates that are not justified by borrowers' creditworthiness; requiring large prepayment penalties while deliberately misleading borrowers about the penalties; convincing borrowers to refinance mortgages into new loans that only benefit Wells Fargo; deceiving borrowers into believing that they are getting fixed-rate loans when they are really getting adjustable rate loans; charging excessive fees; and more.

---

[32] Center for Responsible Lending, *A Review of Wells Fargo's Subprime Lending* (Apr. 2004) at 10 (available at http://www.responsiblelending.org/mortgage-lending/research-analysis/ip004-Wells_Fargo-0404.pdf).

158.   Such reports underscore the foreseeability of foreclosures arising from predatory lending practices, and their attendant harm.

159.   Wells Fargo has intentionally targeted these kinds of predatory practices at African-American and Latino neighborhoods and residents.  Far from being a responsible provider of much-needed credit in minority communities, Wells Fargo is a leading cause of stagnation and decline in African-American and Latino neighborhoods where its foreclosures are concentrated.  Specifically, since at least 2000, its foreclosures have been concentrated in neighborhoods with African-American or Latino populations exceeding 80%.

160.   Although only 14.1% of Wells Fargo's loan originations in Los Angeles from 2004 to 2011 were in census tracts that are at least 80% African-American or Latino, 24.9% of loan originations that had entered foreclosure by February 2013 were in those census tracts.  Similarly, while only 27.1% of Wells Fargo's loan originations in Los Angeles from 2004 to 2011 occurred in census tracts that are at least 50% African-American or Latino, 43.48% of Wells Fargo's loan originations that had entered foreclosure by February 2013 were in those census tracts.  Moreover, while 47.8% of Wells Fargo's loan originations in Los Angeles from 2004 to 2011 occurred in census tracts that were less than 20% African-American or Latino, only 28.4% of Wells Fargo's loan originations that had entered foreclosure by February 2013 were in those census tracts.  This data demonstrates a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

161.   The following map represents the concentration of Wells Fargo's loan originations from 2004 through 2011 that had entered foreclosure by February 2013 in African-American and Latino neighborhoods.   In addition to the disproportionate distribution of Wells Fargo foreclosures in African-American and Latino neighborhoods, disparate rates of foreclosure based on race further demonstrate Wells



Fargo's failure to follow responsible underwriting practices in minority neighborhoods.  While 20.8% of Wells Fargo's loans in predominantly (greater than 80%) African-American or Latino neighborhoods result in foreclosure, the same is true for only 5.0% of its loans in predominantly (greater than 80%) white neighborhoods.  In other words, a Wells Fargo loan in a predominantly African-American or Latino neighborhood is 4.982 times more likely to result in foreclosure as is a Wells Fargo loan in a predominantly white neighborhood.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.



162.   Thus, Wells Fargo's discretionary lending policies and pattern or practice of targeting of minorities, who in fact receive predatory loan terms regardless of creditworthiness, have caused and continue to cause foreclosures in Los Angeles.

**2.     Data shows that Wells Fargo's loans to minorities result in especially quick foreclosures.**

163.   A comparison of the time from origination to foreclosure of Wells Fargo's loans originated in Los Angeles from 2004 to 2011 shows a marked disparity with respect to the speed with which loans to African-Americans and Latinos and whites move into foreclosure.  The average time to foreclosure for African-American borrowers is 3.035 years, and for Latino borrowers is 2.919 years.  By comparison, the average time to foreclosure for white borrowers is 3.418 years.  These statistically significant disparities demonstrate that Wells Fargo aggressively moved minority borrowers into foreclosure, when compared with how the Bank handled foreclosures for white borrowers.

164.   This disparity in time to foreclosure is further evidence that Wells Fargo is engaged in lending practices consistent with reverse redlining.  The disparity in time to foreclosure demonstrates that Wells Fargo is engaged in irresponsible underwriting in African-American and Latino communities that does not serve the best interests of borrowers.  If Wells Fargo were applying the same underwriting practices in African-American and Latino neighborhoods and white neighborhoods in Los Angeles, there would not be a significant difference in time to foreclosure.  Were Wells Fargo underwriting borrowers in both communities with equal care and attention to proper underwriting practices, borrowers in African-American and Latino communities would not find themselves in financial straits significantly sooner during the lives of their loans than do borrowers in white communities.  The faster time to foreclosure in African-American and Latino neighborhoods is consistent with underwriting practices

in minority communities that are less concerned with determining a borrower's ability to pay and qualifications for the loan than they are in maximizing short-term profit.

165.   The HUD/Treasury Report confirms that time to foreclosure is an important indicator of predatory practices:  "[t]he speed with which the subprime loans in these communities have gone to foreclosure suggests that some lenders may be making mortgage loans to borrowers who did not have the ability to repay those loans at the time of origination."[33]

**3.   Data shows that the discriminatory loan terms cause the foreclosures.**

166.   Wells Fargo's discriminatory lending practices cause foreclosures and vacancies in minority communities in Los Angeles.

167.   Steering borrowers into loans that are less advantageous than loans for which they qualify, including steering borrowers who qualify for prime loans into subprime loans, can cause foreclosures because the borrowers are required to make higher loan payments.  The difference between what a borrower who is steered in this manner must pay and the lower payments for which the borrower qualified can cause the borrower to be unable to make payments on the mortgage.  In such instances, the borrower would have continued to make payments on the mortgage and remained in possession of the premises, had Wells Fargo made the loan without improperly steering the borrower into a subprime, or less advantageous, loan.  Steering borrowers in this manner, therefore, causes foreclosures and vacancies.

168.   Giving a loan to an applicant who does not qualify for the loan, especially a refinance or home equity loan, can also cause foreclosures and vacancies.  Some homeowners live in properties that he or she owns subject to no mortgage.  Other homeowners live in properties with modest mortgages that he or she can comfortably afford to pay.  Where a lender, such as Wells Fargo, solicits such a homeowner to take out a home equity loan on their property, or alternatively, to refinance an existing loan

---

[33] HUD/Treasury Report at 25.

into a larger loan without proper underwriting to assure that the borrower can make the monthly payments for the new, larger loan, the result is likely to be that the borrower will be unable to make payments on the mortgage.  This is particularly true where the borrower is refinanced from a fixed-rate loan into an adjustable rate loan that the lender knows the borrower cannot afford should interest rates rise.  In some instances the lender may refinance the borrower into a new loan that the lender knows the borrower cannot sustain, given the borrower's present debt obligations and financial resources.  In such circumstances, the likely result of such practices is to cause homeowners who are otherwise occupying properties without a mortgage, or comfortably making payments on a modest existing mortgage, to be unable to make payments on a new, unaffordable loan.  This, in turn, causes foreclosures and vacancies.  If these unaffordable refinance and home equity loans had not been made, the subject properties would not have become vacant.

169.   A regression analysis of loans issued by Wells Fargo in Los Angeles from 2004-2011, controlling for objective risk characteristics such as credit history, loan-to-value ratio, and the ratio of loan amount to income, demonstrates that a predatory loan is 1.810 times more likely to result in foreclosure than a non-predatory loan.

170.   The regression analysis further demonstrates that a predatory loan in a heavily minority neighborhood (census tract consisting of at least 80% African-American and Latino households) is 3.901 times more likely to result in foreclosure as is a non-predatory loan with similar risk characteristics in a heavily white neighborhood (census tract with at least 80% white households).  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

171.   The regression analysis also demonstrates that a predatory loan made to an African-American borrower was 1.771 times more likely to result in foreclosure aswas a non-predatory loan made to a white borrower with similar borrower and

underwriting characteristics.  A predatory loan made to a Latino borrower was 1.947 times more likely to result in foreclosure as was a non-predatory loan made to a white borrower with similar risk characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

172.   A regression analysis of government loans (FHA/VA) issued by Wells Fargo in Los Angeles from 2009-2011, controlling for borrower race and objective risk characteristics such as ratio of loan amount to income, demonstrates that a government loan is 5.816 times more likely to result in foreclosure as is a non-government loan.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

## VI.   INJURY TO LOS ANGELES CAUSED BY WELLS FARGO'S DISCRIMINATORY LOAN PRACTICES

173.   Los Angeles has suffered financial injuries as a direct result of Wells Fargo's pattern or practice of reverse redlining, and the resulting disproportionately high rate of foreclosure on Wells Fargo loans to African-Americans and Latinos in minority neighborhoods in Los Angeles.  Los Angeles seeks redress for these injuries. The City does not seek redress in this action for injuries resulting from foreclosures on mortgages originated by lenders other than Wells Fargo.

174.   Wells Fargo continues to engage in the discriminatory pattern or practice described herein, with similar and continuing deleterious consequences to the City.

175.   The City seeks damages for its reduced property tax revenues, due to: (a) the decreased value of the vacant properties themselves; and (b) the decreased value of properties surrounding the vacant properties.  In addition, the City seeks damages based on municipal services that it still must provide to remedy blight and

unsafe and dangerous conditions which exist at vacant properties that were foreclosed as a result of Wells Fargo's illegal lending practices.

**A.      Los Angeles has been Injured by a Reduction in Property Tax Revenues from Foreclosures Caused by Discriminatory Loans Issued by Wells Fargo**

176.    As stated in a September 2011 Report by the Alliance of Californians for Community Empowerment and the California Reinvestment Coalition, entitled *The Wall Street Wrecking Ball:  What Foreclosures are Costing Los Angeles Neighborhoods* ("Cost to Los Angeles Report"), "[w]hen a home falls into foreclosure, it affects the property value of the foreclosed home as well as the values of other homes in the neighborhood."  These decreased property values in turn reduce property tax revenues to the City.[34]

177.    "As property values drop an estimated $78.8 billion, Los Angeles communities could lose as much as $481 million in property tax revenue" from the decreased value of the foreclosed homes themselves and those in the surrounding neighborhoods.[35]

**1.      The decreased value of the properties foreclosed by Wells Fargo result in reduced property tax revenues.**

178.    The *Cost to Los Angeles* Report states that "[i]t is estimated that homes in foreclosure experience a 22% decline in value."[36]

179.    For example, "[t]hat means the impact of the 200,000 foreclosures estimated for the period 2008 through 2012 will be more than $26 billion in lost home value in communities across Los Angeles."[37]  A portion of this lost home value is attributable to homes foreclosed as a result of Wells Fargo's discriminatory loan practices.

---

[34] *Cost to Los Angeles* Report at 3.

[35] *Id.*

[36] *Id*.

[37] *Id*.

180.   The decreased property values of foreclosed homes in turn reduce property tax revenues to the City and constitute damages suffered by Los Angeles.

### 2.   The decreased value of properties in the neighborhoods surrounding foreclosed properties results in reduced property tax revenues.

181.   Wells Fargo foreclosure properties and the problems associated with them likewise cause especially significant declines in surrounding property values because the neighborhoods become less desirable.  This in turn reduces the property tax revenues collected by Los Angeles.

182.   Property tax losses suffered by Los Angeles as a result of vacancies resulting from Wells Fargo's foreclosures are fully capable of empirical quantification.

183.   Routinely maintained property tax and other data allow for the precise calculation of the property tax revenues lost by the City as a direct result of particular Wells Fargo foreclosures.  Using a well-established statistical regression technique that focuses on effects on neighboring properties, the City can isolate the lost property value attributable to Wells Fargo foreclosures and vacancies from losses attributable to other causes, such as neighborhood conditions.  This technique, known as Hedonic regression, when applied to housing markets, isolates the factors that contribute to the value of a property by studying thousands of housing transactions.  Those factors include the size of a home, the number of bedrooms and bathrooms, whether the neighborhood is safe, whether neighboring properties are well-maintained, and more.  Hedonic analysis determines the contribution of each of these house and neighborhood characteristics to the value of a home.

184.   The number of foreclosures in a neighborhood is one of the neighborhood traits that Hedonic analysis can examine.  Hedonic analysis allows for the calculation of the impact on a property's value of the first foreclosure in close proximity (*e.g.*, ⅛ or ¼ of a mile), the average impact of subsequent foreclosures, and the impact of the last foreclosure.

185.   Foreclosures attributable to Wells Fargo in minority neighborhoods in Los Angeles can be analyzed through Hedonic regression to calculate the resulting loss in the property values of nearby homes.  This loss can be distinguished from any loss attributable to non-Wells Fargo foreclosures or other causes.  The loss in property value in minority neighborhoods in Los Angeles attributable to Wells Fargo's unlawful acts and consequent foreclosures can be used to calculate the City's corresponding loss in property tax revenues.

186.   Various studies establish that Hedonic regression can be used for this purpose.  A study published by the Fannie Mae Foundation, using Chicago as an example, determined that each foreclosure is responsible for an average decline of approximately 1.1% in the value of each single-family home within an eighth of a mile.[38]

187.   Other studies have focused on the impact of abandoned homes on surrounding property values.  A study in Philadelphia, for example, found that each home within 150 feet of an abandoned home declined in value by an average of $7,627; homes within 150 to 299 feet declined in value by $6,810; and homes within 300 to 449 feet declined in value by $3,542.[39]

188.   These studies highlight the foreseeability of tax related harm to the City as the result of foreclosures arising from discriminatory loans.

189.   And most recently, the *Cost to Los Angeles* Report stated, "[i]t is conservatively estimated that each foreclosed property will cause the value of neighboring homes within an eighth of a mile to drop 0.9%."  Thus, "[i]n Los Angeles, impacted homeowners could experience property devaluation of $53 billion."  This

---

[38] *See* Dan Immergluck & Geoff Smith, *The External Costs of Foreclosure: The Impact of Single-Family Mortgage Foreclosures on Property Values*, 17 HOUSING POLICY DEBATE 57 (2006) at 69.

[39] *See* Anne B. Shlay & Gordon Whitman, *Research for Democracy: Linking Community Organizing and Research to Leverage Blight Policy*, at 21 (2004).

decreased property value of neighboring homes in turn reduces property tax revenues to the City.

190.   Application of such Hedonic regression methodology to data regularly maintained by Los Angeles can be used to quantify precisely the property tax injury to the City caused by Wells Fargo's discriminatory lending practices and resulting foreclosures in minority neighborhoods.

**B.     Los Angeles Is Injured Because It Still Must Provide Costly Municipal Services for Properties in Minority Neighborhoods that Have Become Vacant as a Direct Result of Discriminatory Loans Originated or Purchased by Wells Fargo**

191.   Vacant Wells Fargo foreclosure properties cause direct costs to the City because the City is required to provide increased municipal services at these properties.  These services would not have been necessary if the properties were occupied.

192.   For example, the City's Police Department must send personnel and police vehicles to vacant Wells Fargo foreclosure properties to respond to public health and safety threats that arise at these properties because the properties are vacant. Because violent crime has been found to increase 2.33% for every 1% increase in foreclosures, among other services, LAPD must respond to calls reporting suspicious activity at vacant properties, perform ongoing investigations involving criminal activity, including gang activity, at vacant properties.

193.   Likewise, the Code Enforcement Bureau of the Los Angeles Building and Safety Department ("Building and Safety Department") must devote personnel time and out-of-pocket funds to inspect vacant properties and issue orders for violations of the municipal code to be fixed.  When the municipal code violations are not fixed, the Building and Safety Department is required to perform certain services, including, but not limited to, removing excess vegetation at vacant properties, hauling away trash and debris at vacant properties, boarding vacant property from casual entry, putting up

fencing to secure vacant properties, putting up fencing to prevent access to swimming pools by young children at vacant properties, coordinating with the Los Angeles County Health Department to chemically treat the pools at vacant properties to prevent mosquitoes from breeding, painting and removing graffiti at vacant properties, condemning and demolishing vacant structures deemed an imminent hazard to public safety, and having vacant properties frequented by gangs declared a public nuisance and demolished on that basis.

194.   As stated by the *Cost to Los Angeles* Report, "[l]ocal government agencies have to spend money and staff time on blighted foreclosed properties, providing maintenance, inspections, trash removal, increased public safety calls, and other code enforcement services .... Responding to these needs is a gargantuan task that involves multiple agencies and multiple levels of local government."[40]

195.   Moreover, as discussed above, the Apgar-Duda report underscores the foreseeability of municipal costs as the result of foreclosures arising from discriminatory loans.

## VII.   SAMPLE FORECLOSURE PROPERTIES IN THE CITY OF LOS ANGELES

196.   Plaintiff has already identified one thousand four hundred and forty-seven (1,447) discriminatory loans issued by Wells Fargo in Los Angeles between 2004-2011 that resulted in foreclosure.[41]  The City has already incurred, or will incur in the future, damages corresponding to each of these properties.  A sample of property addresses corresponding to these foreclosures is set forth below:

10614 Anzac Ave., 90002

---

[40] *Id*. at 3.

[41] Plaintiff anticipates that it will be able to identify significantly more foreclosures resulting from the issuance of discriminatory loans during this time period with the benefit of discovery.  This conclusion derives from the fact that, because of certain reporting limitations, the publicly available mortgage loan databases utilized by Plaintiff are not as comprehensive as the mortgage loan databases maintained by and in the possession of an issuing bank.

1040 W. 53rd St., 90037

13420 Desmond St., 91331

10407 Juniper St., 90002

3728 Ruthelen St., 90018

415 E. Vernon Ave., 90011

607 E. 246th St., 90744

1835 W. 65th St., 90047

16522 Hiawatha St., 91344

434 E. 107th St., 90003

## VIII.  STATUTE OF LIMITATIONS AND CONTINUING VIOLATIONS DOCTRINE

197.   As alleged herein, Defendant Wells Fargo has engaged in a continuous pattern and practice of mortgage discrimination in Los Angeles since at least 2004 by imposing different terms or conditions on a discriminatory and legally prohibited basis.  In order to maximize profits at the expense of the City of Los Angeles and minority borrowers, Wells Fargo adapted its unlawful discrimination to changing market conditions.  This unlawful pattern and practice conduct is continuing through the present and has not terminated.  Therefore, the operative statute of limitations governing actions brought pursuant to the Federal Fair Housing Act has not commenced to run.

## IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*)**

198.   Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

199.   Wells Fargo's acts, policies, and practices as described constitute intentional discrimination on the basis of race.  Wells Fargo has intentionally targeted residents of predominantly African-American and Latino neighborhoods in Los Angeles for different treatment than residents of predominantly white neighborhoods in Los Angeles with respect to mortgage lending.  Wells Fargo has intentionally targeted residents of these neighborhoods for high-cost loans without regard to their credit qualifications and without regard to whether they qualify for more advantageous loans, including prime loans.  Wells Fargo has intentionally targeted residents of these neighborhoods for increased interest rates, points, and fees, and for other disadvantageous loan terms including, but not limited to, adjustable rates, prepayment penalties, and balloon payments.  Wells Fargo has intentionally targeted residents of these neighborhoods for unfair and deceptive lending practices in connection with marketing and underwriting mortgage loans.

200.   Wells Fargo's acts, policies, and practices have had an adverse and disproportionate impact on African-Americans and Latinos and residents of predominantly African-American and Latino neighborhoods in Los Angeles as compared to similarly situated whites and residents of predominantly white neighborhoods in Los Angeles.  This adverse and disproportionate impact is the direct result of Wells Fargo's policies of providing  discretion to loan officers and others responsible for mortgage lending; failing to monitor this discretion to ensure that borrowers were being placed in loan products on a nondiscriminatory basis when Wells Fargo had notice of widespread product placement disparities based on race and national origin; giving loan officers and others responsible for mortgage lending large financial incentives to issue loans to African-Americans and Latinos that are costlier than better loans for which they qualify; otherwise encouraging and directing loan

officers and others responsible for mortgage lending to steer borrowers  into high-cost loans or loans with adjustable rates, prepayment penalties, or balloon payments without regard for whether they qualify for better loans, including, but not limited to, prime loans; and setting interest rate caps.  These policies have caused African-Americans and Latinos and residents of predominantly African-American and Latino neighborhoods in Los Angeles to receive mortgage loans from Wells Fargo that have materially less favorable terms than mortgage loans given by Wells Fargo to similarly situated whites and residents of predominantly white neighborhoods in Los Angeles, and that are materially more likely to result in foreclosure.

201.   Wells Fargo's residential lending-related acts, policies, and practices constitute reverse redlining and violate the Fair Housing Act as:

(a)   Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of 42 U.S.C. § 3605(a); and

(b)   Discrimination on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling, in violation of 42 U.S.C. § 3604(b).

202.   Wells Fargo's policies or practices are not justified by business necessity or legitimate business interests.

203.   Wells Fargo's policies and practices are continuing.

204.   The City is an aggrieved person as defined by 42 U.S.C. § 3602(i) and has suffered damages as a result of Wells Fargo's conduct.

205.   The City's damages include lost tax revenues and the need to provide increased municipal services.  The loss of tax revenues at specific foreclosure sites and at closely neighboring properties in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to Wells Fargo's discriminatory lending.  Likewise, the need to provide increased municipal services at blighted foreclosure sites in predominantly minority neighborhoods of the City was a

foreseeable consequence that was fairly traceable to Wells Fargo's discriminatory lending.

206.   Wells Fargo's policies and practices, as described herein, had the purpose and effect of discriminating on the basis of race or national origin.  These policies and practices were intentional, willful, or implemented with reckless disregard for the rights of African-American and Latino borrowers.

**SECOND CLAIM FOR RELIEF**

**(Common Law Claim For Restitution
Based On California Law)**

207.   Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

208.   As a direct and proximate result of Defendants' predatory lending practices, Defendants have been enriched at Plaintiff's expense.  Defendants have failed to remit those wrongfully obtained benefits or reimburse the City for its costs improperly caused by Defendants, and retention of the benefits by Defendants would be unjust without payment.

209.   In addition, to its detriment the City has paid for the Defendants' externalities, or Defendants' costs of harm caused by its mortgage lending discrimination, in circumstances where Defendants are and have been aware of this obvious benefit and retention of such benefit would be unjust.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), the City demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, the City respectfully prays that the Court grant it the following relief:

A.    Enter a declaratory judgment that the foregoing acts, policies, and practices of Wells Fargo violate 42 U.S.C. §§ 3604 and 3605;

B.    Enter a permanent injunction enjoining Wells Fargo and its directors, officers, agents, and employees from continuing the discriminatory conduct described herein, and directing Wells Fargo and its directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the discriminatory conduct described herein, and to prevent additional instances of such conduct or similar conduct from occurring in the future, pursuant to 42 U.S.C. § 3613(c)(1);

C.    Award compensatory damages to the City in an amount to be determined by the jury that would fully compensate the City of Los Angeles for its injuries caused by the conduct of Wells Fargo alleged herein, pursuant to 42 U.S.C. § 3613(c)(1);

D.    Award punitive damages to the City in an amount to be determined by the jury that would punish Wells Fargo for the willful, wanton, and reckless conduct alleged herein, and that would effectively deter similar conduct in the future, pursuant to 42 U.S.C. § 3613(c)(1);

E.    Award the City its reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 3613(c)(2);

F.    Require payment of pre-judgment interest on monetary damages; and

G.    Order such other relief as this Court deems just and equitable.


DATED:  December 5, 2013

By _____
        Michael Feuer (SBN 111529)
        City Attorney
        CITY OF LOS ANGELES
        200 N. Main Street, Room 800
        Los Angeles, CA  90012
        Telephone:  (213) 978-8100
        Mike.feuer@lacity.org

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Elaine T. Byszewski (SBN 222304)
Lee M. Gordon (SBN 174168)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
elaine@hbsslaw.com
lee@hbsslaw.com

Joel Liberson (SBN 164857)
Howard Liberson (SBN 183269)
TRIAL & APPELLATE RESOURCES, P.C.
400 Continental Blvd., 6th Floor
El Segundo, CA 90245
Telephone: (310) 426-2361
joel@taresources.com
howard@taresources.com

Robert S. Peck
CENTER FOR CONSTITUTIONAL
LITIGATION
777 6th Street NW, Suite 520
Washington, DC 20001
Telephone: (202) 944-2803
Robert.peck@cclfirm.com

Clifton Albright (SBN 100020)
ALBRIGHT YEE & SCHMIT
888 West 6th Street, Suite 1400
Los Angeles, CA 90017
Telephone: (213) 833-1700
clifton.albright@ayslaw.com

*Attorneys for Plaintiff the City of Los Angeles*

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-14 658983 V2

- 69 -

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Otis D. Wright II _____ and the assigned Magistrate Judge is _____ Ralph Zarefsky _____.

The case number on all documents filed with the Court should read as follows:

## 2:13-cv-09007-ODW(RZx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____ December 5, 2013 _____
Date

By  APEDRO _____
Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| [x] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring Street, G-8 | 411 West Fourth St., Ste 1053 | 3470 Twelfth Street, Room 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701 | Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

ORIGINAL

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Central District of California

CITY OF LOS ANGELES, a municipal corporation,

          _Plaintiff(s)_

v.

WELLS FARGO & CO., and WELLS FARGO BANK, N.A.,

          _Defendant(s)_

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

CV13-09007-ODW(RZx)

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Elaine T. Byszewski
                                  Lee M. Gordon
                                  HAGENS BERMAN SOBOL SHAPIRO LLP
                                  301 N. Lake Ave., Suite 203
                                  Pasadena, CA 91101

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date: 12/5/2013

_____
Signature of Clerk or Deputy Clerk

1202

COPY

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS  ( Check box if you are representing yourself ☐ ) | DEFENDANTS  ( Check box if you are representing yourself ☐ ) |
|---|---|
| CITY OF LOS ANGELES, a municipal corporation | WELLS FARGO & CO., and WELLS FARGO BANK, N.A. |

| (b) County of Residence of First Listed Plaintiff  LOS ANGELES, CA | County of Residence of First Listed Defendant |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| (c) Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.<br>Michael Feuer (SBN 111529)<br>City Attorney, CITY OF LOS ANGELES<br>200 N. Main Street, Room 800<br>Los Angeles CA 90012, (213) 978-8100 | Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. |
|---|---|

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes  ☒ No      ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Federal Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. Seeking redress for injuries caused by pattern or practice of illegal and discriminatory mortgage lending.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☒ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 220 Foreclosure | | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

CV13-09007

| FOR OFFICE USE ONLY: | Case Number: |
|---|---|

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes ☒ No<br><br>If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF?<br><br>Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT?<br><br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| ☐ Yes ☒ No<br><br>If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A.<br>Los Angeles County | B.<br>Ventura, Santa Barbara, or San Luis Obispo Counties | C.<br>Orange County | D.<br>Riverside or San Bernardino Counties | E.<br>Outside the Central District of California | F.<br>Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | WESTERN |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a).  IDENTICAL CASES:** Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b).  RELATED CASES:** Have any cases been previously filed **in this court** that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X.  SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**   _Michael Heuer_   DATE: 12/5/13

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |