**O**

𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔠𝔬𝔲𝔯𝔱
𝔠𝔢𝔫𝔱𝔯𝔞𝔩 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔠𝔞𝔩𝔦𝔣𝔬𝔯𝔫𝔦𝔞

| | |
|---|---|
| CITY OF LOS ANGELES,<br><br>                    Plaintiff,<br><br>        v.<br><br>WELLS FARGO & CO. and WELLS FARGO BANK, N.A.,<br><br>                    Defendants. | Case No. 2:13-cv-9007-ODW(RZx)<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS [21] AND DENYING DEFENDANTS' MOTION TO STRIKE [22]** |

## I.    INTRODUCTION

This action arises from Defendants Wells Fargo & Co. and Wells Fargo Bank, N.A.'s alleged discriminatory lending practices.  However, unlike many of the home-mortgage cases before this Court, Plaintiff in this action is not a mortgagor but rather the City of Los Angeles ("the City").  The City is seeking damages in the form of lost property tax revenue and increased municipal services stemming from foreclosures that were allegedly a result of Defendants' discriminatory lending practices.

Before the Court is Defendants' Motion to Dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (ECF No. 21.)  The Motion is based on several grounds including lack of Article III and statutory standing, expiration of the statute of limitations, and failure to state a claim.  Also before the

Court is Defendants' Motion to Strike Portions of Plaintiff's Complaint.   (ECF No. 22.)   For the reasons discussed below, the Court **DENIES** both Motions.

## II.   FACTUAL BACKGROUND

The City filed the Complaint on December 5, 2013, asserting two claims for (1) violating the federal Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–19, and (2) common-law restitution.  (ECF No. 1.)

According to the City, Defendants have engaged in discriminatory lending practices that have resulted in a disparate number of foreclosures in minority areas of Los Angeles.  (*See* Compl. ¶ 2.)  Specifically, the City alleges that Defendants have engaged in "redlining" and "reverse redlining."  (*Id.* ¶ 4.)  Redlining is the practice of denying credit to particular neighborhoods based on race.  (*Id.* ¶ 4 n.2.)  Reverse redlining is the practice of flooding a minority neighborhood with exploitative loan products.  (*Id.* ¶ 4 n.3.)  The 69-page, 209-paragraph Complaint includes a regression analysis based on Wells Fargo loans issued in Los Angeles.  (*See, e.g.*, *id.* ¶¶ 152–56.)  The City alleges numerous statistics based on this regression analysis.  One example is that from 2004 to 2011, an African-American borrower was more than twice as likely to receive a "predatory loan" as a white borrower with similar underwriting and borrower characteristics.  (*Id.* ¶ 152.)  Also in the Complaint are confidential witness statements from former employees of Defendants who describe how allegedly predatory loans were specifically marketed to minorities and minority communities in Los Angeles.  (*See, e.g.*, *Id.* ¶¶ 101–126.)

Based on publically available loan data, the City alleges that it has identified 1,447 "discriminatory loans" issued by Defendants in Los Angeles that resulted in foreclosure.  (*Id.* ¶ 196.)  The City expects that number to rise during the course of discovery.  (*Id.* ¶ 196 n.41.)  According to the City, these discriminatory loans were more likely to result in foreclosure, which in turn diminished the City's tax base and led to blight.  (*Id.* ¶¶ 166–72.)  The City is seeking to recover lost property-tax / / /

revenue as well as expenses incurred for increased municipal services.   (*Id.* ¶¶ 173–95.)

On March 3, 2014, Defendants filed the instant Motions.  (ECF Nos. 21, 22.) Due to the complexity of the Motion to Dismiss and the numerous grounds upon which it is based, the Court granted the parties' request for an extended briefing schedule.  (ECF No. 16.)  On May 8, 2014, the Court ordered supplemental briefing on the limited issue of statutory standing in light of the Supreme Court decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (decided Mar. 25, 2014).  The Court held a hearing on both Motions on May 27, 2014.

### III.   LEGAL STANDARD

**A.   Rule 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of a complaint for lack of subject-matter jurisdiction.  The Article III case or controversy requirement limits a federal court's subject-matter jurisdiction, which includes the requirement that plaintiffs have standing to bring their claims.  *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121–22 (9th Cir. 2010).  When a motion to dismiss attacks subject-matter jurisdiction under Rule 12(b)(1) on the face of the complaint, the court assumes the factual allegations in the complaint are true and draws all reasonable inferences in the plaintiff's favor.  *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009).  Moreover, the standards set forth in *Bell Atlantic  Corp. v. Twombly*, 550 U.S. 544 (2007), and  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) apply in equal force to Article III standing when it is being challenged on the face of the complaint.  *See Perez v. Nidek Co.*, 711 F.3d 1109, 1113 (9th Cir. 2013); *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012).  Thus, in terms of Article III standing, the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

/ / /

/ / /

**B.     Rule 12(b)(6)**

Under Rule 12(b)(6), a court may dismiss a complaint for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  To survive a dismissal motion, a complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)—a short and plain statement of the claim.  *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003).  The factual "allegations must be enough to raise a right to relief above the speculative level" and a claim for relief must be "plausible on its face."  *Twombly*, 550 U.S. at 555, 570.

The determination whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S at 679.  A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff.  *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001).   But a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

**C.     Rule 12(f)**

Under Rule 12(f), a court "may order stricken from any pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  The essential function of a Rule 12(f) motion is to "avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial."  *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994).  Rule 12(f) motions to strike are generally disfavored.  *Bureerong v. Uvawas*, 922 F. Supp. 1450, 1478 (C.D. Cal. 1996); *see also Stanbury Law Firm v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir. 2000).

/ / /

/ / /

## IV.   DISCUSSION

Defendants move to dismiss the Complaint on a number of grounds—all of which address the sufficiency of the City's allegations with respect to standing, the statute of limitations, and overall ability to state a claim.   As an alternative to dismissal of the entire Complaint, Defendants also move to strike certain paragraphs as impertinent or immaterial.   The Court addresses each of Defendants' grounds for dismissal and then turns to the Motion to Strike.

### A.   Article III Standing

Article III standing requires a plaintiff to plead three elements.   First, a plaintiff must plead an injury in fact, which must be "concrete and particularized" and "actual or imminent."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).   Second, there must be a "causal connection between the injury and the conduct complained of"—that is the injury must be "fairly traceable" to the challenged conduct.  *Id.* (internal quotations omitted).   Third, it must be likely that plaintiff's injury will be "redressed by a favorable decision."

Here, Defendants claim that the City has failed to plead the second requirement for Article III standing—causation—thus necessitating dismissal of the Complaint for lack of subject-matter jurisdiction under Rule 12(b)(1).   (MTD 9:15–23.)   According to Defendants, the causal chain between the City's alleged injury and Defendants' alleged conduct is too attenuated because there are "too many links" in the causal chain and the City's causation theory relies on too many independent parties over too long a period of time.   (*Id.* at 9:25–14:7.)   On the other hand, the City contends that Defendants' description of the causal chain is too long.   The City articulates the causal chain as having only three parts: (1) Defendants engaged in discriminatory lending practices, (2) that resulted in foreclosures, (3) which in turn caused a reduction in property values that diminished the tax base and increased the need for city services.   (MTD Opp'n 4:19–22.)   The City then points to specific examples in the Complaint that support its theory of causation.   (*Id.* at 4:19–6:4.)

The Court finds that the City has adequately pleaded causation for the purposes of Article III standing. "To survive a motion to dismiss for lack of constitutional standing, plaintiffs must establish a 'line of causation' between defendants' action and their alleged harm that is more than 'attenuated." *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (citing *Allen v. Wright*, 468 U.S. 737, 758 (1984)). But a causal chain "does not fail simply because it has several 'links,' provided those links are 'not hypothetical or tenuous' and remain 'plausible.'" *Id.* (quoting *Nat'l Audubon Soc., Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002)).

The City's lengthy Complaint relies on a regression analysis to support its claims and theory of causation. The regression analysis is based on data reported by Defendants and available through public and private databases. (Compl. ¶ 151.) Supporting the first link in the City's proffered causal chain—Defendants' discriminatory lending practices—are statistics such as from 2004 to 2011 an African-American borrower was more than twice as likely to receive a predatory loan as a white borrower with similar underwriting and borrower characteristics. (*Id.* ¶ 152.) As for the second link—discriminatory loans resulted in foreclosures—the City alleges, for example, that "[a] Wells Fargo loan in a predominantly African-American or Latino neighborhood is 4.982 times more likely to result in foreclosure as is a Wells Fargo loan in a predominantly white neighborhood." (*Id.* ¶ 161.) Also, a "predatory loan made to a Latino borrower was 1.947 times more likely to result in foreclosure as was a non-predatory loan made to a white borrower with similar risk characteristics." (*Id.* ¶ 171.) These foreclosures are then alleged to have caused a reduction in property values that diminished the tax base (*Id.* ¶¶ 176–90) and created an increased need for city services (*Id.* ¶¶ 191–95), which demonstrate the third and final link in the causal chain. *C.f. Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 111 (1997) ("A significant reduction in property values directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and provide services.").

In contrast to the City, Defendants describe the alleged causal chain as having seven "links": (1) Defendants engaged in discriminatory mortgage-origination practices; (2) those practices led to minority borrowers being issued subprime loans; (3) borrowers defaulted because of the discriminatory loan terms; (4) the loan servicer decided to foreclose; (5) the foreclosures caused the homes to be abandoned and not resold to a new buyer; (6) the foreclosed vacant properties, and adjacent parcels, lost value because of the foreclosures and some became blighted; and (7) the decreased property values reduced the City's property tax revenues and led to increased municipal services to address blight.  (*Id.* at 10:7–24.)  Defendants' seven-link causal chain is intended to demonstrate that too many independent parties had to act between Defendants' challenged conduct and the City's alleged harm.  But "[w]hile . . . it does not suffice if the injury complained of is the result of the independent action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (internal quotations and citations omitted).  The Court finds that many of the independent actions that Defendants contend defeat causation are produced by or the result of Defendants' challenged conduct.  For example, based on the allegations in the Complaint, minority borrowers are issued predatory loans because Defendants steered them toward those loans as opposed to less predatory loans.  (*See, e.g.*, Compl. ¶¶ 12–13.)  While the issues raised by Defendants' causal chain may be subject to proof at a later stage in the litigation, the pleading standards for Article III standing are not so burdensome.  The City must be afforded an opportunity to conduct discovery and obtain more property-specific information to meet its burden of actually proving its claims.

Furthermore, the Court is unpersuaded by Defendants' reliance on the facts of *Maya* and *City of Birmingham v. Citigroup Inc.*, No. CV-09-BE-467-S, 2009 WL 8652915 (N.D. Ala. 2009).  In *Maya*, the Ninth Circuit found that homeowners lacked standing to sue developers for injuries allegedly caused by the developers' practice of

marketing and financing neighboring homes to individuals at a high risk of foreclosure.  658 F.3d at 1072 ("[P]laintiffs have not established how defendants' actions *necessarily* resulted in foreclosure . . . .").  But the *Maya* court also held that the district court erred in not granting leave to amend because the homeowners proffered an expert report that allegedly distinguished the effect of the developers' actions from general economic influences.  *Id.* at 1072–73.  The allegations in *Maya* were much more generalized than the allegations in the Complaint at issue here, and the City alleges that Defendants' contribution can be parceled out from the losses attributable to non-Wells Fargo foreclosures and other causes through Hedonic regression analysis.  (*See* Compl. ¶¶ 185–90; MTD Opp'n 7:5–18.)

Moreover, while the court in *City of Birmingham* dismissed similar claims for lack of standing, the opinion is devoid of detail regarding the allegations in the complaint and makes no mention of a regression analysis or confidential witness statements.  *See* 2009 WL 8652915, at *3–4.  More persuasive are the more recent district court cases where courts have found that municipalities have Article III standing at the pleadings stage to sue banks for discriminatory lending practices based on similar statistical evidence and allegations specific to the defendant banks.  *See Dekalb Cnty. v. HSBC North Am. Holdings, Inc.*, No. 1:12-CV-03640-SCJ, 2013 WL 7874104, at *7 (N.D. Ga. Sept. 25, 2013) (holding that government and industry findings along with empirical data raised the pleadings above the speculative level to meet Article III's "fair traceability" requirement); *Mayor & City Council of Balt. v. Wells Fargo Bank, N.A.*, No. JFM-08-62, 2011 WL 1557759, at *3–6 (D. Md. Apr. 22, 2011) (holding that the third amended complaint plausibly alleged standing with property-specific allegations and specific illegal lending practices identified);[1] *City of*

---

[1] Defendants cite an earlier decision in *City Council of Baltimore* where the first amended complaint was dismissed because the causation allegations were not "plausible."  677 F. Supp. 2d 847, 850 (D. Md. Jan. 6, 2010).  But curiously, Defendants neglect to mention the case's subsequent history and dismissal of the first amended complaint was based on generalized allegations regarding foreclosures in the city, as opposed to the bank-specific allegations alleged in the City's Complaint here.  *See id.*

*Memphis v. Wells Fargo Bank, N.A.*, No. 09-2857-STA, 2011 WL 1706756, at *9 (W.D. Tenn. Mar. 4, 2011) (holding that plaintiffs' injuries were fairly traceable because they did not allege that "lending practices resulted in a host of social and political ills plaguing entire sections of the community," but rather that defendants "targeted individual property owners with specific lending practices (reverse-redlining), resulting in specific effects (foreclosures and vacancies) at specific properties, which in turn created specific costs (services and tax revenue) for local government").   The City's allegations are extremely detailed and specific to Defendants' lending practices.   The City has already identified through publicly available loan data 1,447 discriminatory loans issued by Defendants that have resulted in foreclosures in Los Angeles.  (Compl. ¶ 196.)  The City anticipates that it will learn of more loans over the course of discovery.  (*Id.* ¶ 196 n.41.)

For the reasons discussed above, the Court finds that the allegations in the Complaint are sufficient to establish causation at this stage of the litigation and support Article III standing.

**B.    Statutory Standing**

Defendants next argue that the FHA claim must be dismissed because the City lacks statutory standing.[2]  Statutory standing is a different inquiry from Article III standing.  *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 974 n.7 (9th Cir. 2008) (explaining that Article III standing is a jurisdictional requirement while statutory standing is resolved under Rule 12(b)(6)); *see also Cetacean Comm. v. Bush*, 386 F.3d 1169, 1175 (9th Cir. 2004).  Statutory standing looks at whether Congress intended to allow the City to recover for its alleged harm under the FHA.  *See Lexmark*, 134 S. Ct. at 1388.  In the recent *Lexmark* decision, the Supreme Court explained that answering this question involves two principles.  First, it is "presume[d] that a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests

---

[2] Defendants' Motion initially labels the issue "prudential standing," but the Supreme Court made clear in *Lexmark* that the issue is more appropriately classified as "statutory standing."  *Lexmark*, 134 S. Ct. at 1388.

protected by the law invoked.'"  *Id.* (quoting *Allen*, 468 U.S. at 751).  Second, it is also presumed that a statutory cause of action "is limited to plaintiffs whose injuries are proximately caused by violations of the statute."  *Id.* at 1390.  Defendants dispute the City's statutory standing under both principles.

### 1.   Zone of Interests

The zone-of-interests test for statutory standing is not "especially demanding" and the benefit of the doubt goes to the plaintiff.  *Lexmark*, 134 S. Ct. at 1389.  "[T]he test 'forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that" Congress authorized the plaintiff to sue.  *Id.* (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2119, 2210 (2012)).

Defendants, relying on  *Thompson v. North American Stainless, L.P.*, 131 S. Ct. 863 (2011), argue that the City falls outside the FHA's zone of interests because the FHA's purpose is only to provide redress to victims of discrimination in housing transactions and the City itself has not suffered discrimination.  (MTD 14:9–16:1.) But the City contends that its injuries clearly fall within the FHA's zone of interests. (MTD Opp'n 10:22–11:15.)  While *Thompson* was recently decided, the City points out that the case involved Title VII and not Title VIII, which encompasses the FHA. Instead, the City urges the Court to rely on prior Supreme Court precedent holding that Congress intended standing under the FHA to be as broad as Article III standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982) (finding that statutory standing under the FHA is coextensive with Article III standing); *Gladstone*, 441 U.S. at 110 (holding that a municipality has standing under the FHA); *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) (stating that the language of the FHA is "broad and inclusive" and that Congress intended to define standing as broadly as permitted by Article III).  The Court agrees with the City.

/ / /

Under the FHA, an "aggrieved person" is defined as "any person who claims to have been injured by a discriminatory housing practice; or believes that such person will be injured by a discriminatory housing practice that is about to occur."  42 U.S.C. § 3602(i).  In *Thompson*, the Supreme Court interpreted the same "aggrieved person" language in the context of an employment-discrimination suit under Title VII to limit statutory standing by only allowing suit to be brought by employees.  131 S. Ct. at 870.  Thus, Defendants argue that *Thompson* alters the holdings in *Havens Realty*, *Thompson*, and *Gladstone*.  But the Supreme Court explicitly stated otherwise.  *Id.* at 869 ("[I]t is Title VII rather than Title VIII that is before us here . . . .")  The Court in *Thompson* also found that the holding in *Gladstone* remained consistent with its analysis of the "zone of interests" limitation.  *Id.*  Therefore, the Court declines to apply Defendants' selective reading of *Thompson* to limit the zone of interests and statutory standing under the FHA.  Since the Court has already found that the City has adequately alleged Article III standing, the City's alleged injuries fall within the FHA's zone of interests.

### 2.  Proximate Cause

General tort principles of causation apply to damages actions under the FHA, and a plaintiff can establish proximate causation if "the defendant's wrongful conduct was a substantial factor in bringing about the harm in question."  *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1167–68 (9th Cir. 2013).  The principle of proximate causation "reflects the reality that 'the judicial remedy cannot encompass every conceivable harm that can be traced to wrongdoing.'"  *Lexmark*, 134 S. Ct. at 1390 (quoting *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 536 (1983)).  A plaintiff's alleged harm is "too remote" if it is "purely derivative of misfortunes visited upon a third person by the defendant's acts."  *Id.*

The Ninth Circuit uses the following three-factor "remoteness" test to assess proximate causation:

(1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.

*Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957, 963 (9th Cir. 1999).

Defendants claim that the City's alleged injuries—lost property-tax revenue and increased municipal services—are too remote. (MTD 16:7–18:20.) Instead, Defendants argue that the City was only "secondarily injured as the speculative consequence of the alleged injuries suffered by mortgagors." (*Id.* at 15:25–16:1.) Citing the first factor from *Oregon Laborers*, Defendants argue that the mortgagors are more direct victims than the City and the Department of Justice ("DOJ") has already brought suit on behalf of the mortgagors. (*Id.* at 17:10–25.) Furthermore, it will be nearly impossible to ascertain the amount of the City's damages attributable to Defendants' conduct. There is also a risk of multiple recoveries since the City has brought suit against other lenders and the DOJ has already sued. (*Id.* at 17:27–18:20.) However, the City contends that it was directly injured by Defendants' discriminatory lending practices and that its injuries are not derivative of the injuries suffered by borrowers. (MTD Opp'n 14:1–12.) In addition, the City argues that Defendants' proximate-causation arguments require the Court to go beyond the constraints of a Rule 12(b)(6) motion. (*Id.* 13–14.)

The Court finds that the City has met the minimum pleading standards for proximate causation under the FHA. Turning to the first factor of *Oregon Laborers*, the mortgagors are certainly direct victims of Defendants' alleged conduct, but the City is correct in its assertion that its injuries are separate and distinct from the injuries of the mortgagors. Moreover, the City alleges in the Complaint that its injuries—just

like the injuries suffered by the mortgagors—were direct and a foreseeable result of predatory lending practices. (*See, e.g.*, Compl. ¶¶ 74–76, 169–70.) Also, as discussed above with respect to Article III standing, the City alleges in the Complaint that Defendants' contribution to the City's injuries can be calculated through Hedonic regression analysis—distinguishing Defendants' conduct from other causes. (*See id.* ¶¶ 185–90.) This favors the City under the second factor in *Oregon Laborers*. Furthermore, the Court also finds no danger of multiple recoveries—the third factor of *Oregon Laborers*. The DOJ's recovery was for injuries suffered by mortgagors, and, while the City has filed suit against other lenders, the allegations in the Complaint are lender-specific and property-specific. (*See, e.g.*, *id.* ¶ 196.)

In weighing the three factors set forth in *Oregon Laborers*, the Court finds that proximate causation has been adequately pleaded to survive the present Motion to Dismiss. The Court emphasizes that *Oregon Laborers* sets forth a three-factor test and not an elements test, so even if one factor tips in favor of Defendants' position, the totality of the circumstances compels the Court to find in favor of the City. But the issue of proximate cause—along with many of the issues raised in this Motion to Dismiss—will be revisited at later stages of the litigation where the City's allegations will be put to evidentiary proof.

## C.   Statute of Limitations

Defendants also argue that the statute of limitations on the City's FHA claim has already run. Under the FHA, claims must be filed "not later than 2 years after the occurrence or termination of an alleged discriminatory housing practice . . . ." 42 U.S.C. § 3613(a)(1)(A).

According to Defendants, the mortgage-origination practices that the City alleges were discriminatory terminated long before the Complaint was filed on December 5, 2013. Defendants point to certain allegations in the Complaint arguing that the City itself admits that various mortgage-origination practices—in particular subprime lending—ended between 2007 and 2009. (MTD 21:2–17.) Furthermore,

Defendants argue that the City is improperly attempting to mix and match lending practices to demonstrate a "continuing violation" of the FHA and avoid the statute-of-limitations problem.   (*Id.* at 22:21–28; MTD Reply 9:25–11:2.)   Regardless, Defendants claim that the City's allegations of post-2008 conduct fail to meet the pleading standards set out in *Iqbal*.  (MTD 21–24.)

On the other hand, the City claims that Defendants are mischaracterizing the allegations in the Complaint.  (MTD Opp'n 15–18.)  The City acknowledges that the statute of limitations inquiry focuses on when the alleged discriminatory conduct terminated and not when the City's injuries occurred.  *See Garcia v. Brockway*, 526 F.3d 456, 464 (9th Cir. 2008) (holding that the FHA's limitations period does not start when the aggrieved person is injured, but rather at the time "the occurrence or termination of an alleged discriminatory housing practice" occurs).  But according to the City, the allegations in the Complaint demonstrate an eight-year "unbroken pattern and practice of issuing predatory loans."

Based on the allegations in the Complaint, the City has not run afoul of the statute of limitations.  Where a plaintiff challenges not merely a single incident of conduct that violates the FHA, but rather a pattern or practice of discrimination, the statute of limitations runs from the last asserted occurrence.  *See Havens Realty*, 455 U.S. at 380–81.  This is known as the "continuing violation doctrine."  *Id.* at 380.  Here, the City repeatedly alleges in the Complaint that Defendants have engaged in an "unlawful pattern and practice" of mortgage discrimination and that Defendants "adapted to changing market conditions" while continuing to discriminate against minority borrowers in Los Angeles.  (*See, e.g.*, Compl. ¶¶ 3, 8, 43.)  The exact type of loan issued to minority borrowers may have changed, but the City alleges the loans issued to minorities continued to be more high-risk than loans issued to white borrowers.  (*See, e.g.*, *id.* ¶¶ 43, 155.)  Moreover, confidential witness statements in the Complaint allege discriminatory conduct through 2012.  (*Id.* ¶¶ 101–08.)

/ / /

Defendants' reliance on the holding of *Garcia* to reject the City's application of the continuing-violation doctrine and support a finding that the statute of limitations begins to run at the termination of a *specific* discriminatory practice—i.e., subprime lending—is sorely misguided.  In *Garcia*, there were no allegations of a pattern or practice of discrimination.  *Garcia* involved a design-and-construction defect, and the Ninth Circuit held that the statute of limitations began to run at the time construction was completed and not when the plaintiffs encountered or discovered the defect.  526 F.3d at 462–66.  The facts and holding of that case are totally inapposite to the allegations at bar.  In this case, the City is alleging a pattern and practice of "discriminatory lending" on the part of Defendants over at least an eight-year period.  While the types of loans that Defendants allegedly issued to minority borrowers may have changed during the relevant time period, the City alleges that they remained high-risk and discriminatory.  This is sufficient to apply the continuing-violation doctrine.  *See O'Loghlin v. Cnty. of Orange*, 229 F.3d 871, 875 ("[I]f a discriminatory act takes place within the limitations period and that act is related and similar to acts that took place outside the limitations period, all the related acts—including the earlier acts—are actionable as part of a continuing violation.")

The Court finds that the City's FHA claim falls within the statute of limitations based on the allegations in the Complaint.

**D.     Failure to State a Claim Under the FHA**

Defendants also argue that the City's FHA claim fails because the City has not properly alleged a pattern or practice of discrimination.  Defendants contend that the City's allegations are insufficient to establish disparate treatment and that a disparate-impact theory of liability is not available under the FHA.

**1.     Disparate Treatment**

Discriminatory intent or motive is a necessary element of any disparate treatment claim under the FHA.  *See Wood v. City of San Diego*, 678 F.3d 1075, 1081 (9th Cir. 2012) (requiring allegations of discriminatory intent in a disparate treatment

claim under Title VII); *Gamble v. City of Escondido*, 104 F.3d 300, 304–05 (9th Cir. 1997) (holding that the elements of Title VII discrimination claims, including allegations of disparate treatment, are the same as the elements for FHA discrimination claims under Title VII).

According to Defendants, the City has failed to plead that Defendants' allegedly discriminatory lending practices were intentional or racially motivated.  (*See* MTD 24:22–15:13.)  But the Court finds no fault with the City's ample allegations in the Complaint under a theory of disparate treatment.  As the City points out, the Complaint is rife with allegations that Defendants targeted minority borrowers for unfair loan terms based on race or national origin.  (*See, e.g.*, Compl. ¶¶ 11–12; 109–26; 159; 162, 199.)  Moreover, a discriminatory pattern can be probative of motive, and the Complaint contains numerous allegations of statistical patterns of discrimination.  *See Lowe v. City of Monrovia*, 775 F.2d 998, 1008 (9th Cir. 1985) (stating that statistical evidence may be probative of motive).  Accordingly, the Court finds that the City's FHA claim under a theory of disparate treatment is sufficient at the motion-to-dismiss stage.

### 2.   Disparate Impact

Next, Defendants argue that disparate impact is not a viable legal theory under the FHA.  (MTD 26:1–24.)  Defendants rely on the Supreme Court's plurality opinion in *Smith v. City of Jackson, Miss.*, 544 U.S. 228 (2005).  But the Court is unpersuaded. Not only were the justices squarely divided on the disparate-impact issue, but *Smith* involved an Age Discrimination in Employment Act claim under Title VII as opposed to an FHA claim under Title VIII.  Moreover, the Ninth Circuit has explicitly recognized disparate-impact claims under the FHA subsequent to the *Smith* decision along with other circuits.  *Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010); *see also Graoch Assoc. # 33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 392 (6th Cir. 2007); *Reinhart v. Lincoln Cnty.*, 482 F.3d 1225, 1229 (10th Cir. 2007).

1    Defendants also argue that a disparate-impact theory of liability requires the

2    City to plead specific practices that have caused the alleged disparate impact.  (MTD

3    27:1–28:15.)  But the Court finds that the City's allegations are more than sufficient to

4    survive the instant Motion to Dismiss on a disparate-impact theory.  The allegations

5    are specific to Defendants and their lending practices in Los Angeles.  (*See* Compl.

6    ¶¶ 151, 196.)  Defendants' arguments are more appropriate for a later stage in the

7    litigation after the City has had the benefit of discovery.

8    **E.    Restitution**

9    Turning to the City's second claim for restitution, Defendants argue that the

10   claim must be dismissed because there is no cause of action for restitution in

11   California.  (MTD 28:18–25.)  Restitution is a remedy and not a right of action.  (*Id.*)

12   Even if the restitution claim is proper, Defendants contend that the City's claim is a

13   "textbook example" of a formulaic recitation of the elements that fails under

14   *Twombly*.  (*Id.* at 28:26–28.)  Moreover, Defendants argue that there is a disconnect

15   between the dollars the City is seeking to recover and any benefit Defendants may

16   have received.  (*Id.* at 29:1–15.)

17   California courts have stated that "[t]here is no freestanding cause of action for

18   'restitution' in California."  *Munoz v. MacMillan*, 195 Cal. App. 4th 648, 661 (2011);

19   *see also Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010) ("There is

20   no cause of action in California for unjust enrichment.   Unjust enrichment is

21   synonymous with restitution.").  But the inquiry goes beyond that broad statement

22   because, as the City points out in its Opposition, courts in California are actually

23   divided as to whether a claim labeled as "restitution" or "unjust enrichment" should

24   proceed.   *See Ohno v. Yasuma*, 723 F.3d 984, 1006 n.25 (9th Cir. 2013) ("The

25   Supreme Court of California and California Courts of Appeal have recognized actions

26   for relief under the equitable doctrine of unjust enrichment.")   The difference in

27   opinion rests on whether the plaintiff has properly pleaded a claim for quasi-

28   contract—that the defendant has been unjustly enriched at the expense of the

plaintiff—regardless of the label or title the plaintiff puts on the claim. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 4345435, at *3–4 (N.D. Cal. Sept. 15, 2011) (allowing unjust enrichment claim to proceed where the plaintiff invoked a valid theory of recovery). Thus, the Court will not dismiss the City's claim for restitution based solely on its label and instead reviews the Complaint to determine whether the City has alleged a valid theory of recovery.

To seek restitution, the City must allege that Defendants were unjustly enriched at the City's expense. *See McBride v. Boughton*, 123 Cal. App. 4th 379, 389 (2004).

> Under the law of restitution, an individual is required to make restitution if he or she is unjustly enriched at the expense of another. A person is enriched if the person receives a benefit at another's expense. However, the fact that one person benefits another is not, by itself, sufficient to require restitution. The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it.

*Id.* (internal citations and quotations omitted); *see also Durell*, 183 Cal. App. 4th at 1370 (quoting *McBride*).

Here, the City contends that the benefits it conferred on Defendants are the so-called "externalities"—the costs of harm caused by Defendants' discriminatory lending that the City has had to shoulder. (Opp'n 27:11–28:9; Compl. ¶¶ 173–96.) "Unjust enrichment arises not only where an expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss." *White v. Smith & Wesson Corp.*, 97 F. Supp. 2d 816, 829 (N.D. Ohio Mar. 14, 2000). This Court, in line with similar decisions from trial courts across the country, finds that the City has properly alleged a benefit to state a theory of recovery for restitution. *See id.* (allowing unjust-enrichment claim where city sued gun manufacturer for failing to incorporate safety devices into handguns and negligent marketing practices); *City of Boston v. Smith & Wesson Corp.*, No. 199902590, 2000

1   WL 1473568, at *18 (Mass. Super. Ct. July 13, 2000) (sustaining unjust-enrichment

2   claim at pleadings stage based on "externalities" that the city covered due to gun

3   manufacturer's actions); *City of N.Y. v. Lead Indus. Ass'n, Inc.*, 190 A.D. 2d 173, 177

4   (N.Y. App. Div., May 13, 1993) (allowing restitution claim for "reasonable costs of

5   [lead] abatement" to survive motion to dismiss).

6   **F.   Allegations Against Wells Fargo & Co.**

7          Defendant Wells Fargo & Co. ("Parent") is the parent company of Defendant

8   Wells Fargo Bank, N.A. ("Sub").   Parent seeks to be dismissed from this action

9   because the Complaint makes no allegations relating to Parent except "a conclusory

10  allegation of agency."   (MTD 29:17–26.)   According to Parent, the allegations as

11  plead would disturb the "general principle of corporate law deeply ingrained in our

12  economic and legal systems that a parent corporation . . . is not liable for the acts of its

13  subsidiaries."   *U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal citations and

14  quotations omitted); *see also Doe v. Unocal Corp.*, 248 F.3d 915, 925–26 (9th Cir.

15  2001) (citing *Bestfoods*).   In addition, Parent argues that the City cannot impose

16  successor liability on Parent for its acquisition of other mortgage lenders such as

17  Wachovia Mortgage.   (MTD 29:27–30:16.)   In its Opposition, the City contends that

18  the agency and successor-liability allegations in the Complaint are sufficient under

19  Rule 8(a).   (MTD Opp'n 28:10–29:15.)

20         Parent companies may be liable for their own unlawful acts, the unlawful acts

21  of subsidiary companies that act as their agents, and the unlawful acts of their

22  predecessors.   *See Bestfoods*, 524 U.S. at 64–65; *Doe v. Unocal Corp.*, 248 F.3d at

23  926; *Monaco v. Bear Stearns Cos.*, No. CV 09-05438-SJO (JCx), 2011 WL 4059801,

24  at *19 (C.D. Cal. Sept. 12, 2011).   Successor liability applies if,

25         (1) the successor expressly or impliedly agrees to assume the subject

26         liability . . . , (2) the transaction amounts to a consolidation or merger of

27         the successor and the predecessor, (3) the successor is a mere

28         continuation of the predecessor, or (4) the transfer of assets to the

1     successor is for the fraudulent purpose of escaping liability for the

2     predecessor's debts.

3 *CenterPoint Energy, Inc. v. Super. Ct.*, 157 Cal. App. 4th 1101, 1120 (2007.)

4     In the Complaint, the City alleges that Parent is the parent of Sub. (Compl.

5 ¶ 25.) The City also alleges that each Defendant acted as an agent of the other and

6 that each ratified and adopted acts or omissions of the other. (*Id.* ¶ 30.) Under

7 Rule 8(a), these agency allegations are sufficient to survive the instant Motion to

8 Dismiss. *See, e.g.*, *Reyes v. Premier Home Funding, Inc.*, 640 F. Supp. 2d 1147, 1160

9 (N.D. Cal. June 17, 2009) (finding general agency allegations sufficient but

10 dismissing on other grounds); *Cuevas v. Atlas Realty/Fin. Servs., Inc.*, No. C 07-

11 02814 JF, 2008 WL 268981, at *4 (N.D. Cal. Jan. 30, 2008) (holding that general

12 agency allegations between lender and mortgage broker were sufficient); *Deirmenjian

13 v. Deutsche Bank, A.G.*, No. CV 06-00774-MMM(CWx), 2006 WL 4749756, at *29

14 (C.D. Cal. Sept. 25, 2006) (holding that general agency allegations are sufficient

15 under Rule 8(a)).

16     The Court also finds that the allegations against Parent based on a theory of

17 successor liability, while limited, are just enough to get the City past the motion-to-

18 dismiss stage. The City alleges that Parent is liable for the loans acquired through

19 other lending entities such as Wachovia Mortgage and World Savings Bank and that it

20 learned about Parent's responsibility for these acquired loans from information

21 reported through the Home Mortgage Disclosure Act. (Compl. ¶ 2 n.1, ¶ 29.) The

22 Court finds that the allegations are sufficient to put Parent on notice, which is all that

23 is required under the liberal pleading standards of Rule 8(a). *See, e.g.*, *Monaco*, 2011

24 WL 4059801, at *19 (holding that the liberal requirements of Rule 8(a) apply to

25 allegations concerning successor liability); *Pac. Rollforming, LLC v. Trakloc Intern.

26 LLC*, No. 07cv1897-L(JMA), 2008 WL 4183916, at *3 (S.D. Cal Sept. 8, 2008)

27 (explaining that successor-in-interest allegations need only meet the liberal pleading

28 standard set forth in Rule 8(a)(2)).

**G.      Motion to Strike**

Finally, the Court briefly addresses Defendants' Motion to Strike.  Defendants identify numerous paragraphs in the Complaint that they contend are impertinent and immaterial.  "'Impertinent' matter consists of statements that do no pertain, and are not necessary, to the issues in question."  *Fogerty*, 984 F.2d at 1527.  "Immaterial" matter "has no essential or important relationship to the claim for relief or the defenses being pleaded."  *Id.*  The Court has reviewed the paragraphs identified by Defendants and finds that none rise to the level of being either impertinent or immaterial under Rule 12(f).  Every paragraph relates to mortgage-lending practices.  The paragraphs that are not specific to Defendants' lending practices or Los Angeles serve a contextual purpose that the Court finds entirely proper.  Defendants' arguments in the Motion to Strike would be more appropriate at a later stage in the litigation in the form of evidentiary objections.

## V.      CONCLUSION

For the reasons discussed above, the Court **DENIES** Defendants' Motion to Dismiss and **DENIES** Defendants' Motion to Strike.  (ECF Nos. 21, 22.)  Defendants shall file their answer to the Complaint within 14 days.

**IT IS SO ORDERED.**


May 28, 2014


_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**