O
JS-6

# United States District Court
# Central District of California

| | |
|---|---|
| CITY OF LOS ANGELES,<br><br>          Plaintiff,<br><br>   v.<br><br>WELLS FARGO & CO.; WELLS<br>FARGO BANK, N.A.,<br><br>          Defendants. | Case No. 2:13-cv-09007-ODW(RZx)<br><br>**ORDER GRANTING<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT [92]** |

## I.    INTRODUCTION

Pending before the Court is a Motion for Summary Judgment filed by Defendants Wells Fargo & Co. and Wells Fargo Bank, N.A. (collectively "Wells Fargo"). (ECF No. 92.) Pursuant to the parties' stipulations and the Court's December 10, 2014 Order, the first phase of this case focuses exclusively on whether the statute of limitations bars this suit filed by Plaintiff City of Los Angeles (the "City"). (ECF Nos. 80, 81.) The pending Motion for Summary Judgment is not only the end of this first phase, but the conclusion of the entire case. The undisputed facts demonstrate that Wells Fargo did not violate the Fair Housing Act during the limitations period.

/ / /

/ / /

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Alleged Facts

The City's Complaint, filed on December 5, 2013, alleges that Well Fargo violated the federal Fair Housing Act (the "Act"), 42 U.S.C. §§ 3601–3619. (ECF No. 1.)   According to the City, Wells Fargo engaged in discriminatory and predatory mortgage lending practices that resulted in a disparate number of residential home foreclosures for minority borrowers in Los Angeles.  (Compl. ¶ 2.)  The City alleges that "Wells Fargo has engaged in a continuous pattern and practice of mortgage discrimination in Los Angeles since at least 2004 by imposing different terms or conditions on a discriminatory and legally prohibited basis."  (*Id.* ¶ 3.)  The alleged pattern and practice of lending discrimination "consist[ed] of traditional redlining and reverse redlining, both of which have been deemed to violate the [Act] by federal courts throughout the country."  (*Id.* ¶ 4.)   According to the City, "Wells Fargo engaged in reverse redlining, and continues to engage in such conduct, by extending mortgage credit on predatory terms to minority borrowers in minority neighborhoods in Los Angeles on the basis of the race and ethnicity of its residents."  (*Id.*)  Wells Fargo's redlining and reverse redlining allegedly resulted in both intentional discrimination and disparate impact discrimination.  (*Id.* ¶ 2.)

In describing the specifics of reverse redlining, the Complaint identifies eight types of allegedly "predatory" home loans issued by Wells Fargo to minority borrowers:  (1) high-cost loans (defined by the City as loans with an interest rate three percentage points or more above the federally established benchmark); (2) subprime loans; (3) interest-only loans; (4) balloon payment loans; (5) loans with prepayment penalties;  (6) negative-amortization loans;  (7) no-documentation loans;  and  (8) adjustable rate mortgage loans with "teaser" rates.  (*Id.* ¶ 144.)  The Complaint also alleges that Wells Fargo issued United States Federal Housing Authority loans ("USFHA loans"), which are described as loans with "higher risk features such as

/ / /

higher fees and higher interest rates," and while "not inherently predatory," are problematic.  (*Id.* ¶ 43 n.15.)

**B.     Motion to Dismiss and Subsequent Procedure**

On March 3, 2014, Wells Fargo moved to dismiss the City's Complaint.  (ECF No. 21.)  Wells Fargo's Motion to Dismiss challenged the Complaint on numerous grounds, to include the Act's 2-year statute of limitations.  (*Id.* at 18.)  *See* 42 U.S.C. § 3613(a)(1)(A) (a cause of action under the Act must be filed "not later than 2 years after the occurrence or termination of an alleged discriminatory housing practice").  Wells Fargo argued that various allegedly predatory lending practices ended well before the 2-year limitations period and there was no "continuing violation" of the Act.  (*See id.*)  Accepting the allegations in the Complaint as true, the Court rejected Wells Fargo's argument and denied the motion.  (ECF No. 37.) [1]

The Court explained that while Wells Fargo may have ended some lending practices before the limitations period began, the Complaint alleges that Wells Fargo replaced one discriminatory lending practice with another.  (*Id.* at 14.)  These allegedly questionable practices also continued into the limitations period.  (*Id.*)  The City alleged that the "eight-year 'unbroken pattern and practice of issuing predatory loans' . . . remained high-risk and discriminatory."  (*Id.*)  The Court found that because the City alleged a continuous pattern and practice of discrimination that continued into the limitations period, the continuing violations doctrine would allow pre-limitations-period conduct into the suit.  (*Id.* at 14–15.)

Several months after the Court issued its decision, the parties stipulated to a scheduling order that limited the first phase of the litigation to the statute of limitations issue.  (ECF No. 80.)  The parties indicated that they would be filing summary judgment motions "as to whether any allegedly discriminatory loans were issued within 2 years prior to [the City] filing" the lawsuit.  (*Id.* at 4.)  On April 7, 2015, Wells Fargo filed the pending Motion for Summary Judgement.  (ECF No. 92.)

---

[1] *City of Los Angeles v. Wells Fargo & Co.*, 22 F. Supp. 3d 1047 (C.D. Cal. 2014).

The City filed a timely Opposition on May 4, 2015 (ECF No. 94) and Wells Fargo a timely Reply on May 18, 2015 (ECF No. 107).  The Court held a hearing on June 1, 2015.  (ECF No. 109.)  The Motion is now pending before this Court for Consideration.

## C.   Summary Judgment Facts

The limitations period began on December 5, 2011—two years prior to the filing of the Complaint—and the parties do not dispute that Wells Fargo terminated most of the alleged "predatory" lending practices well before December 2011.  (UF Nos. 1–2, 4–14.)[2]  The parties not only agree that most practices ended before the limitations period began, but they also agree that only two types of allegedly predatory loans were issued during the limitations period: "high-cost loans" and USFHA loans.  (UF Nos. 3, 14.)  Thus, the focus of Wells Fargo's Motion and the City's Opposition is whether high-cost loans and USFHA loans are actually predatory or adverse to minority borrowers.  The parties do not dispute many of the basics behind each loan.

### 1.   High-Cost Loans

The definition of "high-cost loans" evolved during litigation.  In the Complaint, the City defines these loans as "loans with an interest rate that was at least three percentage points above a federally-established benchmark."  (Compl. ¶ 144; PUF No. 113.)  Based on this definition, it is undisputed that Wells Fargo originated no high-cost loans during the statutory period.  (UF No. 3.)   In its Opposition Brief, the City changes the definition.  The City explains that "High-Cost loans, as defined by [the Home Mortgage Disclosure Act ("HDMA")], are loans that have a particularly high cost for the borrower in terms of the rate spread . . . [and] [t]he spread has to be at least 1.5% for first-lien loans, and at least 3.5% for subordinate lien loans, to be reported to HMDA as High-Cost."  (Opp'n 13.)

/ / /

---

[2] All citations to "UF" denote undisputed facts.  (*Compare* ECF No. 92-2, Separate Statement of Uncontroverted Facts in Support of Wells Fargo's Motion for Summary Judgment ["DUF"], *with* ECF No. 94-1, Plaintiff's Separate Statement of Genuine Disputes of Material Facts ["PUF"].)

Based on the new definition, it is undisputed that Wells Fargo issued twenty-seven high-cost loans to minority borrowers during the statutory period. (UF No. 118.) The City provides no evidence on whether any of these twenty-seven loans resulted in foreclosure.

### 2. USFHA Loans

USFHA loans feature "down payment[s] . . . as low as 3.5% of the purchase price," "[l]ow closing costs," and "[e]asy credit qualifying." (UF No. 29.) USFHA loans are fully amoritizing, do not impose prepayment penalties, require documentation of a prospective borrower's income and assets, and prohibit adjustable rate mortgages with teaser rates. (UF Nos. 40–43.) The federal government provides the required mortgage insurance for USFHA loans. (UF No. 30.) USFHA borrowers are always required to purchase an upfront mortgage insurance premium ("UFMIP") and are often required to purchase a monthly insurance premium ("MIP"). (UF No. 64.) During the statutory period, the UFMIP rate ranged from 1.00 percent to 1.75 percent. (UF Nos. 65–66.) A borrower seeking a USFHA loan was required to pay the UFMIP upfront or finance the entire amount over the term of the loan. (UF No. 68.) Generally, USFHA borrowers financed the UFMIP which distributed the cost of the UFMIP over the term of the loan. (UF No. 70.) UFMIP is not required for conventional loans. (UF No. 73.) In the vast majority of cases, USFHA borrowers also had to pay an MIP that varied according to the loan-to-value ratio and the term of the loan. (UF No. 71.) Borrowers that elect conventional loans generally must also pay some sort of MIP. (UF No. 72.) Conventional borrowers could cancel their MIP once they had paid 20 percent of their principle, while USFHA borrowers could not cancel their MIP until they had paid 22 percent of their principle. (UF Nos. 76–77.)

The City offers evidence that "genuine issues of fact remain as to whether [USFHA] loans were more expensive to borrowers." (PUF No. 74.) Wells Fargo provides evidence that "[USFHA] loans are more expensive for some borrowers, while conventional loans are more expensive for other borrowers." (DUF No. 74.) It

is undisputed that Wells Fargo's website acknowledges that USFHA loans "may be a more expensive financing option." (UF No. 75.) The parties also do not dispute "[Wells Fargo's] internal marketing document identifies [USFHA] loans as having features that would allow [Wells Fargo] to increase lending to low-to-moderate-income borrowers." (UF No. 92.) The parties dispute whether borrowers who received USFHA loans paid more for their loans than borrowers who received conventional loans. (PUF Nos. 31–32.)

Wells Fargo issued 140 USFHA loans to African-Americans during the limitations period, 625 to Hispanic borrowers, and 385 to Caucasian borrowers. (UF No. 98; Ayers Rep., Table 3.) Of all USFHA loans issued to minority borrowers during the limitations period, only 4 resulted in foreclosure—one half of one percent. (UF No. 60.)

## III.   LEGAL STANDARD

Summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative," the Court may grant summary judgment. *Id.* at 249–50 (citation omitted). A party cannot create a genuine issue of material fact by making bald assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982). At the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559–60 (2006).

1    The moving party has the burden of demonstrating the absence of genuine

2  issues of fact for trial.  *Celotex*, 477 U.S. at 323.  To meet its burden, "the moving

3  party must either produce evidence negating an essential element of the nonmoving

4  party's claim or defense or show that the nonmoving party does not have enough

5  evidence of an essential element to carry its ultimate burden of persuasion at trial."

6  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000)

7  (citation omitted).  Once the moving party satisfies its initial burden of production, the

8  burden shifts to the nonmoving party to show that there is a genuine issue of material

9  fact.  *Id.* at 1103.

10                              **IV.   DISCUSSION**

11    In its Motion for Summary Judgment, Wells Fargo again asserts the

12  applicability of the statute of limitations.  There are two interwoven legal questions at

13  issue.  The first question is whether the continuing violations doctrine applies.  The

14  statute of limitations is two years, yet the discriminatory conduct alleged in the

15  Complaint dates back nearly a decade.  In order for the City to sue Wells Fargo for all

16  discriminatory conduct in the last ten years, the City must prove that the continuing

17  violations doctrine applies.  The doctrine allows conduct that occurred outside the

18  limitations period into the suit on the condition that the City proves there is a

19  continuous unlawful practice that continued *into* the limitations period.  The City must

20  prove that Wells Fargo violated the Act within the limitations period.  Thus, in order

21  to answer the first question, the Court must answer a second question: whether there is

22  a genuine dispute of material fact as to whether Wells Fargo violated the Act during

23  the limitations period.  Stated differently, the core issue for this phase of the litigation

24  is whether Wells Fargo violated the Act during the limitations period triggering the

25  continuing violations doctrine.

26    The Court will first discuss the continuing violations doctrine. Next, the Court

27  will examine the substance of a disparate treatment claim under the Act, including

28  recent guidance from the Supreme Court in *Texas Department of Housing and*

*Community Affairs v. Inclusive Communities Project*, No. 13-1371, 2015 WL 2473449 (U.S. June 25, 2015).  Finally, the Court will apply this recent guidance to the City's claim that high-cost and USFHA loans issued by Wells Fargo to minority borrowers violates the Act.  As described in further detail below, the undisputed evidence clearly demonstrates that neither lending practice violates the Act.

**A.    The Continuing Violations Doctrine**

Any claim under the Act must be brought within two years of "the occurrence or termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A).   However, a pattern-or-practice theory of liability may revive acts outside the statutory period if those acts are part of a "continuing violation."  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81 (1982).  Supreme Court precedent instructs that claims challenging "an unlawful practice" under the Act are timely as long as the "last asserted occurrence" of that practice "continues *into* the limitations period."  *Id.* (emphasis added); s*ee also Wallace v. Chicago Housing Authority*, 321 F. Supp. 2d 968, 973 (N.D. Ill. 2004) ("The amended text of the FHA coupled with the Supreme Court's holding in *Havens* demonstrates that where a plaintiff properly alleges a pattern of conduct that violates the FHA, acts that occur prior to the limitations period are actionable as long as they are part of the alleged pattern.")

In *Havens*, the Supreme Court explained that the continuing violations doctrine, as its name suggests, applies to violations that *continue*.  455 U.S. at 368.  The case involved allegations that an apartment complex denied renter applications on the basis of race.   *Id.*   Some of the alleged discriminatory denials occurred before the limitations period, and others during the limitations period.  *Id.* at 369.  The question before the Court was whether the continuing violations doctrine would allow the lawsuit to include conduct occurring both outside and during the statute of limitations period.  *Id.* at 380.  The Court explained "that where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that *continues into the limitations period*, the complaint is timely

1  when it is filed within [the statute of limitations] of the last asserted occurrence of that

2  practice." *Id.* at 380–81 (emphasis added).

3      The Court ultimately held that the continuing violations doctrine applied. *Id.* at

4  381. The Court reasoned that the plaintiffs "alleged that petitioners' continuing

5  pattern, practice, and policy of unlawful racial steering has deprived them of the

6  benefits of interracial association," and "[p]lainly the claims, as currently alleged, are

7  based not solely on isolated incidents involving the two respondents, but a continuing

8  violation manifested in a number of incidents . . . ." *Id.*

9  **B.    Disparate Impact Claims Under the Act and Recent High Court Guidance**

10      The Court now turns to the Act itself to decide whether any violations occurred

11  within the limitations period. The purpose of the Act is to "provide, within

12  constitutional limitations, for fair housing throughout the United States." 42 U.S.C.

13  § 3601. Section 3605(5) of the Act provides:

14          It shall be unlawful for any person or other entity whose

15          business includes engaging in real estate-related transaction

16          to discriminate against any person in making available such

17          a transaction, or in the terms or conditions of such

18          transaction, because of race, color, religion, sex handicap,

19          familial status, or national origin.

20  42 U.S.C. § 3605(a); *see also* 42 U.S.C. § 3604(b) (prohibiting discrimination in the

21  "sale or rental of a dwelling").

22      A plaintiff can bring a claim under the Act under two different theories:

23  disparate treatment or disparate impact. *Gamble v. City of Escondido*, 104 F.3d 300,

24  304–05 (9th Cir. 1997); *see also Ojo v. Farmers Group., Inc.*, 600 F.3d 1201, 1203

25  (9th Cir. 2010). "In contrast to a disparate-treatment case, where a 'plaintiff must

26  establish that the defendant had a discriminatory intent or motive,' a plaintiff bringing

27  a disparate impact claim challenges practices that have a 'disproportionately adverse

28  effect on minorities' and are otherwise unjustified by a legitimate rationale."

*Inclusive Communities*, 2015 WL 2473449, at *3 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)).

To establish a prima facie case for disparate impact liability under the Act, a plaintiff must prove the occurrence of certain outwardly neutral policies and a disproportionately adverse impact on persons of a particular class caused by the defendant's facially neutral practices. *See Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 711 (9th Cir. 2009); *Pfaff v. U.S Dep't of Housing and Urban Dev.*, 88 F.3d 739, 745 (9th Cir. 1996). The Department of Housing and Urban Development ("HUD") recently codified the three-part burden-shifting test for disparate impact claims under the Act. *See* Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11460-01 (Feb. 15, 2013). First, the plaintiff "bears the burden of proving its prima facie case that a practice results in, or would predictably result in, a discriminatory effect on the basis of a protected characteristic." *Id.* at 11460. If the plaintiff can make a prima facie showing, the burden shifts to the defendant "to prove that the challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests." *Id.* "If the respondent or defendant satisfies this burden, then the charging party or plaintiff may still establish liability by proving that the substantial, legitimate, nondiscriminatory interest could be served by a practice that has a less discriminatory effect." *Id.*; *see also Ojo*, 600 F.3d at 1203 (applying three-part burden-shifting test).

In *Inclusive Communities Project*, the Supreme Court elaborated on the availability of a disparate impact claim under the Act. At issue in the case was Texas's distribution of federal tax credits to housing developers for the construction of low-income housing. *Inclusive Communities*, 2015 WL 2473449, at *4. Texas issued the tax credits after considering a variety of "selection criteria," such as construction projects in "census tracts populated predominantly by low-income residents," the "financial feasibility" of the project, and the availability of "good schools." *Id.* Texas was sued under the Act by a non-profit organization which alleged that Texas "has

10

caused continued segregated housing patterns by its disproportionate allocation of the tax credits, granting too many credits for housing in predominantly black inner-city areas and too few in predominately white suburban neighborhoods." *Id.* The non-profit claimed that Texas "must modify its selection criteria in order to encourage the construction of low-income housing in suburban communities." *Id.*

After affirming the continued viability of disparate impact claims under the Act, the Court discussed the "limit[s]' of such claims to "avoid the serious constitutional questions that might arise." *Id*. at *13. One such constitutional concern is if "liability were imposed based solely on a showing of statistical disparity." *Id.* The Court explained that if a plaintiff relies on statistical disparity, the claim "must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id.* at *14. Lower courts must ensure that disparate impact claims "solely" seek to remove policies that are "artificial, arbitrary, and unnecessary barriers" and not "valid governmental and private priorities." *Id.* at *16. Additionally, a plaintiff must prove a "robust causality" between the policy and the statistical disparity to ensure "that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protect[] defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)). The Court emphasized the need for "adequate safeguards" at the prima facie stage to ensure race is not used "in a pervasive way" and to prevent governmental and private entities from using "numerical quotas." *Id.* Lower courts must examine the prima facie claims "with care" using such "cautionary standards." *Id.* at *15.

The Court then briefly applied these "cautionary standards" to the merits. It explained:

> From the standpoint of determining advantage or disadvantage to racial minorities, it seems difficult to say as a general matter that a decision to build low-income housing

11

in a blighted inner-city neighborhood instead of a suburb is discriminatory, or vice versa.  If those sorts of judgments are subject to challenge without adequate safeguards, then there is a danger that potential defendants may adopt racial quotas—a circumstance that itself raises serious constitutional concerns.

*Id.* at *15.  The Supreme Court instructed the lower court to ensure that the non-profit's disparate impact claim does not "cause[] private developers to no longer construct or renovate housing units for low-income individuals," as such a result would "undermine[]" the purpose of the Act.  *Id.*  The Court did not ultimately decide whether the non-profit proved a prima facie case of disparate impact under the Act, as the only question before the Court was whether disparate impact claims are still viable under the Act.  The case was "remanded for further proceedings consistent with this opinion."  *Id.* at *16.

## C.     The City's Case

As explained in Part II.A, the City's entire theory of liability in this case is disparate impact under the Act.  The City does not contend that any disparate treatment violations of the Act occurred during the limitations period.[3]  The City

---

[3] The Complaint contains several suspicious allegations of purposeful discrimination at Wells Fargo. For example, a confidential Wells Fargo employee, identified as "CW2" in the Complaint, stated:  "I did not see a lot of minority loans being approved . . . Most of the loans I was approving were white."  (Compl. ¶ 133.)  Once litigation began, CW2 gave a sworn statement that he "did not make the statements that are attributed to 'CW2' in the City of L.A.'s legal complaint."  (UF No. 51.) CW2 was one of many confidential witnesses cited in the Complaint, yet it is undisputed that none of the witnesses, including CW2, were employed at Wells Fargo during the limitations period.  (UF Nos. 47–49.)  Despite having no evidence of intentional discrimination during the limitations period, the City claims that "statistical evidence establishing disparate impact can also support disparate treatment."  (Opp'n 3.)  The Court disagrees.  Proof of disparate impact discrimination does not independently support a disparate treatment claim.  *See Frank v. United Airlines, Inc.*, 216 F.3d 845, 859 n.3 (9th Cir. 2000) ("It is an exercise in fruitless abstractions to hypothesize that one could recover under a disparate treatment theory relying on evidence of a pattern or practice after failing to recover under a disparate impact theory."); *U.S. E.E.O.C. v. Newport Mesa Unified Sch. Dist.*, 893 F. Supp. 927, 930 n.2 (C.D. Cal. 1995).

claims two of Wells Fargo's lending practices during the limitations period violated the Act under the disparate impact theory of liability:  high-cost and USFHA loans. (Opp'n 1.)  Wells Fargo argues that there is no genuine dispute of fact that either loan violated the Act.  (Mot. 20–21.)  The Court will first examine the high-cost loans issued during the limitations period.[4]

1.     **There is No Genuine Dispute as to Material Fact That High-Cost Loans Do Not Violate the Act.**

Wells Fargo argues that high-cost loans do not violate the Act because (1) the statistical disparity is too small to establish a basis of liability, and (2) the City failed to identify a Wells Fargo policy that caused the disparity.  (Mot. 14–17.)

a.     **The Lack of Quantitative Evidence**

During the limitations period, Wells Fargo issued 4,260 loans to minority borrowers.  (Ayers Rep. ¶ 38, Table 3.)  Of those 4,260 loans, only 27 were high-cost loans.  (*Id.*)  Of those 27 loans, only 12 were loans for homes occupied by the owner. (*Id.* ¶ 62 n.42.)  This is a relevant distinction because the Act does not apply to non-owner occupied investment properties.[5]

---

[4] The Complaint clearly defines high-cost loans as "loans with an interest rate that was at least three percentage points above a federally-established benchmark."  (Compl. ¶ 144.)  Once the City realized that Wells Fargo did not issue any high-cost loans fitting this definition (*see* UF Nos. 3, 57), it relaxed the controlling definition.  Now, "high-cost loans" are loans with rates only 1.5 percentage points above the federal benchmark.  (Opp'n 13.)  The City claims that this new definition is used by HUD.  (*Id.* [citing 12 C.F.R. § 203.4(a)(12)].)  The City's last-minute decision to apply a more permissive definition carries no legal significance, but is just another example of the City's inability to prove the bold claims it asserted in the Complaint.

[5] *See, e.g., Home Quest Mortg. LLC v. Am. Family Mut. Ins. Co.*, 340 F. Supp. 2d 1177, 1186 (D. Kan. 2004) ("Extending the [Act] to prevent discrimination against a person who owns residential property as a commercial venture would do nothing to further the stated purpose of the [Act], which is to 'provide fair housing.'"); *Germain v. M & T Bank Corp.*, No. 13-cv-7273, 2015 WL 3825198, *10 (S.D.N.Y June 19, 2015) ("Accordingly, § 3605 does not apply to the transaction alleged in the Amended Complaint because Plaintiffs' purpose in applying for the loan was commercial, rather than residential, and the discrimination that they allege is directed at them as commercial applicants, rather than the prospective residents of the property."); *Miller v. Bank of Am., N.A.*, No. 01-1651, 2005 WL 1902945, *6 (D.D.C. July 13, 2005); *Shaikh v. City of Chicago*, No. 00-c-4235, 2001 WL 123784, *4 (N.D. Ill. Feb. 13, 2001) ("[T]he [Act] does not apply to the sale of residential property

Of all owner-occupied high-cost loans issued in the two-year limitations period, 5 went to African-American borrowers and 7 went to Hispanic borrowers, while at the same time 4 high-cost loans were issued to Caucasians.  (Ayers Rep. ¶ 62 n.42.)  The City's expert, Ian Ayers, determined "that an Hispanic Wells Fargo borrower with average non-race characteristics had a 0.0033% likelihood of receiving a High-Cost Loan, a similarly situated African-American Wells Fargo borrower had a 0.0067% likelihood of receiving a High-Cost Loan, while a similarly situated non-Hispanic white borrower face only a 0.0008% likelihood of receiving a High-Cost Loan."  (*Id.* ¶ 61.)  Ayers concedes that "[b]ecause of the small number of owner-occupied High-Cost Loans in the data . . . these disparities are not statistically significant."  (*Id.* ¶ 62 n.42.)  Ayers even described the disparities among racial groups as "negligible."  (*Id.* ¶ 14.)

The City argues that 12 of the 4,260 loans to minority borrowers—or 0.28 percent of all loans issued to minorities—demonstrate a disparate impact claim under the Act.  The Court, and apparently the City's own expert, is not convinced.  The City is required to prove a "*significantly* adverse" effect on minorities.  *See Budnick v. Town of Carefree*, 518 F.3d 1109, 1118 (9th Cir. 2008) (emphasis added).  The City's only evidence to prove a significant adverse effect is the blistering statistical comparison of "0.0033% likelihood" to "0.0008% likelihood."  A statistical disparity relying on thousandths of a percentage "is merely colorable [and] not significantly probative."  *See Anderson*, 477 U.S. at 248.  The Supreme Court has explained that in disparate impact cases, while there is no "rigid mathematical formula," precedent has "consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation."  *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 995 (1988).  There is simply no question that the statistical disparity must be "sufficiently substantial" or "significant."  *See, e.g., Washington v. Davis*, 426 U.S.

---

to a person who is buying the property as a commercial venture, has no intention of residing in the property, and is not suing on behalf of protected class members who would reside there.").

229, 246–47 (1976) ("hiring and promotion practices disqualifying substantially disproportionate numbers of black"); *Dothard v. Rawlinson*, 433 U.S. 321, 327 (1977) (employment standards that "select applicants for hire in a significantly discriminatory pattern"); *Gamble*, 104 F.3d at 306 ("[Plaintiff] has advanced no evidence that such a discriminatory effect occurs or that it occurs significantly."). The Ninth Circuit has also recognized that disparate impact claims cannot rest on statistically insignificant disparities. *See Kim v. Commandant, Def. Language Inst.*, 772 F.2d 521, 523–24 (9th Cir. 1985).

The Court is cognizant of the prohibition against weighing the evidence at summary judgment. *See, e.g., Am. Tower Corp. v. City of San Diego*, 763 F.3d 1035, 1043 (9th Cir. 2014). However, the Supreme Court's recent guidance in *Inclusive Communities* precludes the City's statistical disparity evidence from creating a genuine dispute regarding a prima facie case. This Court must examine the City's prima facie evidence "with care." *Inclusive Communities*, 2015 WL 2473449, at *15. The evidence here consists of 5 high-cost loans issued to African-Americans and 7 high-cost loans issued to Hispanics, while 4 high-cost loans issued to Caucasians. The difference between 0.0033 percent and 0.0008 percent does not create a genuine dispute such that a jury must decide this issue. As the City's own expert concedes, the evidentiary disparities are negligible. The City must provide evidence of a *significantly* disproportionate effect on minorities, and comparing thousandths of a percentage fails to meet the minimum threshold of *Inclusive Communities*. Wells Fargo carried its burden of demonstrating the absence of a genuine dispute by showing that the City does not have enough evidence to support its claim. *See Nissan Fire*, 210 F.3d at 1102.

### b. The Failure to Identify a Policy That Caused the Racial Disparity

Even if the Court found that 5 high-cost loans issued to African-American and 4 high-cost loans issued to Caucasians somehow created a genuine dispute of fact

regarding a disproportionate adverse effect, the City's argument still fails.  The City was required to point to a Wells Fargo policy or policies that caused the disparity. *Inclusive Communities*, 2015 WL 2473449, at *14.  The City's entire disparate impact claim must "solely" seek to remove a policy that is "artificial, arbitrary, and [an] unnecessary barrier[]." *Id.* at *16.  Wells Fargo, as the moving party, argues that the City does not have any evidence that even suggests a Wells Fargo policy created the racial disparity.  The City responds by arguing that "[Wells Fargo's] inadequate monitoring policies" caused the disparate impact.  (Opp'n 14.)  The City argues that Wells Fargo's "risk management policies failed to appropriately monitor relevant data to identify and correct the disproportionate issuance of High-Cost loans to minority borrowers that occurred here.  In short, [Wells Fargo's] inadequate monitoring policies resulted in the disparate issuance of High-Cost loans to minority borrowers." (*Id.*)

The City's argument is problematic for two reasons.  First, the City fails to actually identify any policy that created an artificial, arbitrary, or unnecessary barrier.  Instead, the City argues that a *lack* of a policy produced the disparate impact.  There is no authority that suggests that disparate impact claims are designed to impose new policies on private actors.  Guidance from the Supreme Court is unambiguous that disparate impact claims must solely seek to *remove* barriers.  *Inclusive Communities*, 2015 WL 2473449, at *13, *16.  Without identifying an actual policy that creates a barrier, the City cannot base its disparate impact claim on Wells Fargo's practice of issuing high-cost loans.

Second, the City is essentially advocating for racial quotas.  The City argues that Wells Fargo must employ a policy that would "monitor relevant data" and "correct the disproportionate issuance" of high-cost loans to minorities.  (Opp'n 14.) This is a roundabout way of arguing for a racial quota.  The City wants Wells Fargo to keep a racial tally of each high-cost loan—"monitor relevant data"—and then specifically issue loans on the basis of race to "correct the disproportionate issuance."

Such a policy is inapposite to the instructions from the Supreme Court.  In *Inclusive Communities*, the Supreme Court specifically noted that disparate impact claims must not force private actors to "adopt racial quotas."  *Inclusive Communities*, 2015 WL 2473449, at *15.  The Court explained that such quotas "raise[] serious constitutional concerns."  *Id.*  The City is arguing that the lack of an unconstitutional racial quota is the cause of the statistical discrepancy in this case.  Wells Fargo cannot constitutionally issue high-cost loans based on a racial quota system, and its lack of such a policy does not create a prima facie case of disparate impact under the Act.  Not only did the City fail to identify any policy that caused the negligible statistical disparities, it advocates for the implementation of "serious constitutional concerns."  There is no genuine dispute as to any material fact that high-cost loans issued by Wells Fargo to minority borrowers during the limitations period did not violate the Act.

### 2.     There is No Genuine Dispute as to Material Fact That USFHA Loans Do Not Violate the Act.

As detailed in Part II, very few facts surrounding USFHA loans are disputed.  The parties agree that USFHA loans are beneficial in many respects.  USFHA loans provide down payments as low as 3.5 percent of the purchase price, low closing costs, less rigorous credit requirements, full amortization, no prepayment penalties, proof of income, and no teaser rates.  (UF Nos. 29, 40–43.)  The City's expert even acknowledges the benefits of USFHA loans:  "Borrowers with fewer assets may be more likely to demand loan products requiring low down payments, such as [US]FHA loans, than borrowers with greater assets."  (Ayers Rep. ¶ 46.)  The parties also agree that USFHA loans have some drawbacks when compared to conventional loans.  The principle drawbacks identified by the City are UFMIP and MIP—the two required mortgage insurance premiums.  UFMIP is always required on USFHA loans, its rate can be as high as 1.75 percent, and it must be paid up front or financed over the term of the loan.  (UF Nos. 64–66, 68, 70.)  Meanwhile, MIP cannot be cancelled until the

borrower pays 22 percent of the principle, while conventional loan borrowers can cancel MIP once 20 percent of the principle is paid.  (UF Nos. 76–77.)  As a result of UFMIP and MIP, the parties agree that USFHA loans can be, but are not always, more expensive than conventional loans.  (UF No. 74.)

The City also contends that USFHA loans are more expensive because they "have higher APRs than conventional loans made to similarly situated borrowers." (PUF No. 84.)  Wells Fargo's expert concluded that there was "no statistical evidence whatsoever" that USFHA had higher APRs.  (DUF No. 82.).  The City is correct in its assertion because APRs for USFHA loans automatically include the additional rates for UFMIP and MIP if those premiums are financed over the life of the loan.   12 C.F.R. § 1026.4(b)(5) ("The finance charge includes . . . Premiums or other charges for any guarantee or insurance protecting the creditor against the consumer's default or other credit loss."); *see also* Paul Barron, Dan Rosin, 1 Fed. Reg. Real Estate and Mortgage Lending § 10:13 (4th ed. 2015) ("The Federal Housing Administration . . . provide[s] full or partial insurance that a loan will be repaid if the borrower defaults and the sale of the property does not produce sufficient funds for full repayment.  The full amount of these premiums over the life of the loan must be included in the finance charge.").   The simple existence of UFMIP and MIP directly results in the higher APRs associated with USFHA.  Therefore the Court will focus its attention on UFMIP and MIP in determining whether a genuine dispute of fact exists that USFHA loans violate the Act.  The Court begins this analysis with step one of the three-part burden-shifting test.

> **a.   Prima Facie Case of Disproportionate Adverse Effect on Minorities**

The first step in making a prima facie case of disparate impact liability requires the City to present evidence that USFHA loans have a "disproportionately *adverse* effect on minorities." *Inclusive Communities*, 2015 WL 2473449, at *3 (emphasis added).  Wells Fargo argues that the City cannot make a prima facie case because the

evidence surrounding USFHA loans demonstrate that the loans are not adverse to minority borrowers.  (Mot. 20–22.)   The City responds by arguing USFHA loans are adverse to minority borrowers because these loans "have higher costs to borrowers than conventional loans."  (Opp'n 5.)  The only evidence to support the City's claim is the requirement that USFHA borrowers finance UFMIP or MIP over the course of their loan.  (Opp'n 5–8.)

The Court must determine whether UFMIP and MIP are actually adverse to minority borrowers and whether these insurance premiums raise a genuine dispute of fact precluding summary judgment.  The City believes that the Court should make this determination in a vacuum.  According to the City, it raised a genuine issue of fact as to whether USFHA loans are adverse because USFHA loans require UFMIP and MIP and conventional loans do not.  The City believes that identifying UFMIP and MIP, without regard to any other aspect of USFHA loans, is enough to carry its burden. The benefits of USFHA loans are completely irrelevant to the City.

The Court cannot analyze bits and pieces of USFHA loans without considering the entire loan because *Inclusive Communities* instructs the Court to analyze the City's claims "with care."  Carelessness is determining whether an entire lending practice is adverse based on a single provision.  To conduct the proper analysis, the Court must consider the benefits and purpose of USFHA loans.

### b.      The Benefits of USFHA Loans

While conventional lending practices generally require excellent credit and a 20 percent down-payment, USFHA lending allows Wells Fargo to issue a home loan to a borrower with a poor credit history who can only put down 3.5 percent of the total loan amount.  The undisputed facts demonstrate that 91 percent of minority borrowers who obtained USFHA loans put less than 5 percent down on their home.  (UF No. 33; Siskin Supp. Rep. Table 3.)  If Wells Fargo normally issues loans to borrowers with excellent credit and 20 percent down, why would it take such a financial risk in issuing a loan to a borrower with poor credit and only 3.5 percent down?  The answer

is obvious—the federal government acts as a safety net.  The federal government assumes the risk so that families who could not afford a loan can obtain one.  Wells Fargo knows that it can issue what would otherwise be a high-risk loan because the federal government is the guarantor of the loan and assumes the risk of default.  The mortgage insurance is what allows borrowers to put 3.5 percent down.  It is also what allows borrowers with poor credit histories to obtain a home loan.  The federal government's insurance—UFMIP and MIP—is the sole reason the loan exists at all.

Unsurprisingly, the federal government does not provide such a service for free. *See infra* pp. 24.  The federal government passes the insurance costs on to the customer in the form of UFMIP and MIP.  As a result, a consumer with very little down and a poor credit report can buy a home for his or her family with paid assistance from the federal government.  While it is true that conventional borrowers do not have to pay for UFMIP and MIP, it is also true that those borrowers had to build an excellent credit history and pay at least 20 percent of the loan upfront—two requirements many low-income borrowers cannot meet.

When the benefits and purpose of USFHA loans are considered, the Court fails to see how minority borrowers are adversely affected.  USFHA loans allow low-income families, who could otherwise not qualify for a loan, to buy a home.  The Court is not alone in questioning the City's claim that USFHA loans hurt minorities. The executive branch, which is responsible for creating and monitoring USFHA loans, repeatedly praises the benefits USFHA loans.  In its 2014 annual report to Congress, the HUD Secretary reported that USFHA lending "continues to play a crucial role in supporting minority homeownership."  U.S. Dept. of Hous. & Urban Dev., *Annual Report to Congress Regarding the Financial Status of the FHA Mutual Mortgage Insurance Fund Fiscal Year 2014*, 18 (Nov. 17, 2014).  The Secretary further reported that "while FHA insurance was used for approximately 23 percent of all home purchase loans, FHA accounted for 46.3 percent of home purchases by African

/ / /

20

American households and 47.9 percent of purchases by Hispanic households." *Id.* The report continues:

> Minority buyers continue to represent nearly one-third of FHA-insured first-time homebuyers in FY 2014.   In particular, the share of African American and Hispanic homebuyers increased over the last fiscal year.   The total purchase volume for Hispanic homebuyers increased from 16.8 percent to 19.0 percent, and purchase volume for African American homebuyers increased from 9.3 percent to 10.7 percent.

*Id.* at 20.

In its 2013 report to Congress, the HUD Secretary boasted that "while FHA insurance was used for approximately 30 percent of all home purchase loans, FHA accounted for 53 percent of home purchases by Black or African American Household and 55 percent of purchases by Hispanic households."  U.S. Dept. of Hous. & Urban Dev., *Annual Report to Congress Fiscal Year 2013 Financial Status FHA Mutual Mortgage Insurance Fund*, 18 (Dec. 13, 2013).  In 2012, the HUD Secretary reported that USFHA loans have "continued to be a vital source of home financing for minority borrowers.  While FHA insurance was used for approximately 27 percent of all home purchase mortgages in 2011, FHA accounted for 50 percent of home purchase mortgages for African American borrowers and 49 percent for Hispanic/Latino borrowers."  U.S. Dept. of  Hous. & Urban Dev., *Annual Report to Congress Fiscal Year 2012 Financial Status FHA Mutual Mortgage Insurance Fund*, 7 (Nov. 16, 2012).

Just this past January, President Barak Obama announced that his administration will reduce the insurance premiums required on USFHA loans.  Office of White House Press Secretary, *Fact Sheet: Making Homeownership More*

/ / /

*Accessible and Sustainable*, Jan. 7, 2015.[6]  The White House press release announcing the reductions praised the availability of USFHA loans which "help hundreds of thousands of additional families own a home for the first time."  *Id.*

The federal government is not alone in acknowledging the benefits of USFHA loans.  In 2007, the City passed a resolution encouraging borrowers, to include "seniors and minorities," to seek USFHA loans.  (ECF No. 92, Patashnik Decl., Ex. L, at 1.)  This 2007 resolution even trumpets the benefits of USFHA loans, such as "lower down payment[s]," and the availability to "borrowers with higher credit risk." (*Id.* at 2.)  Even other courts have recognized that HUD programs "insure private lenders against loss on home mortgage loans, thereby making those loans more widely available to a greater portion of the population."  *Capitol Mortgage Bankers, Inc. v. Cuomo*, 22 F.3d 151, 152 (4th Cir. 2000).

Despite the endorsement of the White House, the HUD Secretary, and former City officials, the City now wants this Court to find that USFHA loans are adverse to minorities.  Not only does the federal government endorse USFHA loans, but it endorses the fact that *almost half* of minority borrowers sought USFHA loans.  The HUD Secretary sees strong USFHA lending to minority borrowers as a sign of progress, yet the City sees this lending as evidence of racial discrimination.  There is no dispute that USFHA loans can be more expensive for borrowers as a result of UFMIP and MIP, but the Court cannot let this cost be the only consideration when determining whether USFHA loans are adverse.  The Court must examine the allegations "with care," and as a result, it is undisputed that the additional costs are what allow a low-income minority family to buy a home.

When USFHA loans are analyzed on the whole, there is no evidence that minority borrowers with USFHA loans are adversely affected.[7]  The Court must reject

---

[6] Available at https://www.whitehouse.gov/the-press-office/2015/01/07/fact-sheet-making-homeownership-more-accessible-and-sustainable.

[7] This conclusion is bolstered by the undisputed evidence that of the 765 USFHA loans issued to minority borrowers, only 4 resulted in foreclosure.  (UF No. 60.)

the City's argument in light of the instructions in *Inclusive Communities*.  Since the City's claim that USFHA loans are adverse is based solely on the existence of UFMIP and MIP, without *any* consideration of the benefits provided by USFHA loans, there is no genuine dispute that USFHA loans are not adverse to minority borrowers.  The Court therefore concludes that there is no genuine dispute of fact that Wells Fargo's issuance of USFHA loans during the limitations period did not violate the Act.  The disparate impact claim fails.

c. **The Failure to Identify a Policy That Caused the Racial Disparity**

Wells Fargo further argues that the City fails to identify a policy that produced the disparate impact.  (Mot. 22–23.)  As discussed *supra*, the City is required to point to a Wells Fargo policy or policies that caused the adverse disparity.  *Inclusive Communities*, 2015 WL 2473449, at *14.  The City's entire disparate impact claim must "solely" seek to remove a policy that is "artificial, arbitrary, and [an] unnecessary barrier[]."  *Id.* at *16.

The City argues that three different Wells Fargo policies regarding USFHA loans caused the significantly adverse effect on minorities.  First, the City claims that Wells Fargo's compensation policy provides an incentive for loan officers to steer borrowers to FHA loans because compensation is tied to loan volume.  (Opp'n 8–9.)  Without providing any evidence, the City claims that "the loan volume is higher for FHA loans" because the borrower puts less down.  (*Id.* at 9.)  Wells Fargo responds with actual evidence that indicates that the average conventional loan is more than $167,000 greater than the average USFHA loan.  (Reply 11; Siskin Supp. Rep. ¶ 12 n.6.)  This evidence fully rebuts the City's claim.  The City also fails to explain how USFHA loan volume creates an adverse *racial* disparity.  Because the City makes no attempt to link loan volume and adverse racial disparity, the Court rejects this argument.

/ / /

23

Second, the City claims that Wells Fargo's "internal marketing documents identify the 'borrower profile' for [US]FHA loans as a borrower with little or no cash available, possibly with non-traditional credit or previous credit challenges, among other characteristics."  (Opp'n 9 [citing UF No. 91].)  According to the City, this internal policy "contributes to the disproportionate issuance of [US]FHA loans to minority borrowers." (*Id.*)  This argument is meritless.  The President, Congress, and HUD Secretary would all agree with Wells Fargo—USFHA loans are intended to help low-income borrowers.  That is the exact reason this lending practice was created in the first place. *See, e.g., HUD Annual Report to Congress 2014* at 18.  Wells Fargo's compliance with federal programs and procedures cannot mean that Wells Fargo created an artificial, arbitrary, or unnecessary barrier.

Third, the City argues that Wells Fargo lacked a policy that monitors relevant race data, *i.e.*, a racial quota.  (Opp'n 9–10.)  The City made this exact argument in claiming that the lack of such an unconstitutional policy in issuing high-cost loans resulted in a disproportionately adverse effect on minorities. *See supra* Part IV.C.1.b. For the same reasons the Court rejected the argument with respect to high-cost loans, it rejects the same argument for USFHA loans.

### d.    The Federal Policy Behind USFHA Loans

While the City claimed that three different Wells Fargo policies created an "artificial, arbitrary, and [an] unnecessary barrier," each claim is meritless, unsupported by evidence, or both.  The actual policy behind UFMIP and MIP comes from Washington D.C.  The United States federal government is not only the entity that requires USFHA borrowers to pay for UFMIP and MIP (UF No. 30), but it is the *recipient* of the fees. *See* 24 C.F.R. §§ 203.259a, 203.280, 203.27(a)(2); 57 Fed. Reg. 15208-01 (Apr. 24, 1992) ("For FHA-insured single family mortgages . . . the law requires HUD to establish and collect (1) an up-front mortgage insurance premium (MIP) payment . . . and (2) annual periodic premium payments of 0.5% of the remaining insured principal balance.").  Wells Fargo did not decide to impose UFMIP

1  and MIP on minority borrowers and did not collect a dime from UFMIP and MIP

2  charges. The only decision Wells Fargo made was to participate in this federally

3  created and sanctioned lending program.

4        To even participate in this lending program, Wells Fargo was required to

5  "furnish to the Secretary [of Housing] a signed statement in a form satisfactory to the

6  Secretary listing any charge, fee or discount collected by the mortgagee from the

7  mortgagor. All charges, fees or discounts are subject to review by the Secretary both

8  before and after endorsement." 24 C.F.R. § 203.27(d). HUD even provides further

9  protections for USFHA borrowers. A federal regulation requires that a "mortgagee

10 must provide a prospective FHA mortgagor with an informed consumer choice

11 disclosure notice if, in the mortgagee's judgment, the prospective FHA mortgagor

12 may qualify for similar conventional mortgage products offered by the mortgagee."

13 24 C.F.R. § 203.10. The required disclosures include a "one page generic analysis

14 comparing the mortgage costs of an FHA-insured mortgage with the mortgage costs of

15 similar conventional mortgage products" and "when the requirement to pay FHA

16 mortgage insurance premiums terminate." 24 C.F.R. § 203.10(b)(1).

17       If any disparate impact results from USFHA loans, it is a result of federal policy

18 and not Wells Fargo policy. Furthermore, the federal government is clearly

19 unconcerned by the large number of minority families seeking USFHA loans as HUD

20 boasts about these statistics on an annual basis. *See HUD Annual Report to Congress*

21 *2014* at 18. Furthermore, *Inclusive Communities* instructs lower courts to ensure

22 defendants are not "held liable for racial disparities they did not create." *Inclusive*

23 *Communities*, 2015 WL 2473449, at *16. The racial disparities in this case are clearly

24 the result of purposeful federal government action and not the result of Wells Fargo's

25 decision to participate in USFHA lending. Wells Fargo's passive participation in a

26 program explicitly designed to give minority borrowers access to affordable loans

27 does not prove that Wells Fargo is imposing unnecessary barriers on minorities.

28 / / /

1    Outside of racial quotas, what practice could Wells Fargo possibly employ to
2    avoid a disparate number of minorities receiving USFHA loans?  Subjecting banks to
3    liability for the intended consequences of USFHA lending would likely cause them to
4    stop participating in the federal program.  As a result, fewer minority families would
5    be able to buy homes.  This would produce a serious chilling effect.  "If the specter of
6    disparate-impact litigations causes private" banks from issuing loans to "low-income
7    individuals, then the [Act] would have undermined its own purpose as well as the
8    free-market system."  *Id.* at *15.  The City's claims in this lawsuit are the exact
9    theories of disparate impact liability the Supreme Court wants to prevent.

10   The Court concludes that the City failed to identify any artificial, arbitrary, or
11   unnecessary policy of *Wells Fargo* that produced a significantly adverse disparate
12   impact.  This failure serves as an independent basis to conclude that there is no
13   genuine dispute of fact that Wells Fargo's issuance of USFHA loans during the
14   limitations period did not violate the Act.

**D.    Applicability of Continuing Violations Doctrine**

16   There is no genuine dispute of fact that Wells Fargo's issuance of high-cost and
17   USFHA loans did not violate the Act during the limitations period.  Without a
18   violation of the Act "continu[ing] *into* the limitations period," *see Havens*, 455 U.S. at
19   380–81 (emphasis added), the continuing violations doctrine does not apply.   The
20   City's entire case thus stands or falls on Wells Fargo's conduct that occurred after
21   December 5, 2011, and as just explained, Wells Fargo did not violate the Act during
22   that period.    Therefore, Wells Fargo is entitled to summary judgement.  *See* Fed. R.
23   Civ. P. 56.

**E.    The City's Decision to Challenge USFHA Loans**

25   The City began this litigation with great expectations.  It wanted to hold Wells
26   Fargo accountable for its role in the subprime mortgage crisis of last decade.  The City
27   held nothing back in accusing Wells Fargo of preying on minority families in Los
28   Angeles.  (Compl. ¶ 12.)  The City insinuated that it would vindicate the rights of the

oppressed minority homeowner through this suit.  (*Id.* ¶¶ 14, 23.)  When confronted with the statute of limitations and the continuing violations doctrine, the City took a scorched-earth approach.  The City argued that this Court should declare USFHA loans violate the Act because the loans are adverse to minority borrowers.  The City took this position because it was one of the only options it had to prove a violation of the Act within the limitations period.  In the name of advocating on behalf of minority borrowers, the City decided to fight for an outcome that would hurt those same borrowers.  That decision is disheartening.

Obtaining homeownership is not easy, and as HUD explains, "[t]here are multiple barriers that prevent minority families from becoming homeowners."  U.S. Dept. of Housing and Urban Development, *Barriers to Minority Homeownership*, Apr. 9, 2010.[8]  These barriers include "lack of capital for the down payment and closing costs," "lack of access to credit and poor credit history," and "lack of understanding and information about the home-buying process."  *Id.*  According to HUD, "[d]own payment costs—including closing costs—remain the most significant single barrier to homeownership, especially for low-to-moderate-income households."  *Id.*  In September 2014, the Wall Street Journal reported that "[a]s the housing recovery continues in fits and starts, [African American] and Hispanic borrowers are receiving a smaller share of mortgage loans."  Joe Light, *Minority Borrowers Feel Mortgage Pinch*, WALL STREET JOURNAL, Sept. 22, 2014.[9]  The article notes:  "Many consumer advocates and banks generally agree the decline in the share of lending to minorities is a result of lenders' and regulators' more-stringent credit requirements."  *Id.*

USFHA loans help low-income families overcome those barriers.  Minority borrowers with poor credit and little money for a down payment can put their family in a home through a USFHA loan.  The City apparently does not care about barriers to

---

[8] Available at http://archives.hud.gov/reports/barriers.cfm
[9] Available at http://www.wsj.com/articles/new-mortgage-loans-fell-11-in-2013-to-8-7-million-1411402718.

minority homeownership or the benefits USFHA loans provide to low-income Angelenos. The City was willing to end a program specifically designed to help minority borrowers in exchange for a few thousand dollars in the City coffer. The City is not a champion of minority rights as it declared in the Complaint. While this case began with allegations that Wells Fargo trampled the rights of minorities, it ends with the City's failed attempt to engage in the exact same conduct.

## V. CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendants' Motion for Summary Judgment. (ECF No. 92.) The Court **ORDERS** that judgement be entered as follows:

1. Judgement for DEFENDANTS WELLS FARGO & CO. and WELLS FARGO BANK, N.A., and against PLAINTIFF CITY OF LOS ANGELES;

2. Each party to bear their own attorneys' fees and cost;

3. The Clerk of the Court shall close this case.

**IT IS SO ORDERED.**

July 17, 2015

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**